# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MEDALLION PRODUCTS, INC.;
ENVERA, LLC; and PERFORMANCE
CHEMICALS, INC.,

       Plaintiffs,

       v.

H.C.T.V., INC.; PLYMOUTH DIRECT, INC.;
HARRIET CARTER GIFTS, INC.; NATURE'S
PILLOWS, INC.; DIRECT RESPONSE, INC.;
MEDIA ENTERPRISES II, INC.
d/b/a MEDIA ENTERPRISES, INC.;
BILL McALISTER; BRAD SPECTER;
STEVE SILBIGER; and INNOVATIVE CHEMICALS
CORPORATION,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 06 C 2597

Judge John W. Darrah

## MEMORANDUM OPINION AND ORDER

Plaintiffs filed a multi-count complaint against Defendants, seeking injunctive relief and monetary damages. Presently before the Court are Defendant's, Innovative Chemicals Corporation's, Motion to Dismiss and Defendants, H.C.T.V., Inc; Plymouth Direct, Inc.; Harriet Carter Gifts, Inc.; Nature's Pillows, Inc.; Direct Response, Inc.; Media Enterprises II, Inc. d/b/a Media Enterprises, Inc.; Bill McAlister; Brad Specter; and Steve Silbiger's (collectively, NPI Defendants) Motion to Dismiss.

## BACKGROUND

A reading of the Second Amended Complaint supports the following summary of the alleged operative conduct of the parties.

Medallion Products, Inc. is engaged in the business of designing and marketing consumer products that are initially marketed in television infomercials with follow-up marketing of successful infomercial products to the Internet, catalog and retail outlets. Performance Chemicals, Inc. manufactures and sells chemical products. Envera, LLC provides biochemical technical and laboratory services, including the testing of biochemical agents.

Harriet Carter Gifts, Inc. is the parent corporation of H.C.T.V., Inc. and Plymouth Direct, Inc. Harriet is engaged in its own name in the coordination, control, and facilitation of the sales and supply operations of H.C.T.V. and Plymouth and in the sale of products through catalogs that it operates and controls. H.C.T.V. and Plymouth distribute products on television and other media. Steve Silbiger is the Senior Marketing Director and an officer, agent, and employee of H.C.T.V. and Plymouth. Nature's Pillows, Inc. ("NPI") and Direct Response, Inc. are marketing companies engaged in the multi-media marketing, distribution, and sale of consumer products designed by others. Bill McAlister and Brad Specter own and control NPI and Direct Response. Media Enterprises II, Inc. d/b/a/ Media Enterprises, Inc. is engaged in multi-media support operations for NPI and Direct Response. Media Enterprises is owned and controlled by McAlister and Specter. Innovative Chemicals Corporation ("ICC") is in the business of developing, manufacturing, and selling chemical products.

In September 2004, Specter and McAlister, acting individually and on behalf of Media, and/or NPI and/or Direct Response (hereinafter the "NPI Defendants"), contacted Monica Kroeger and Sheetal Ghai of Medallion, inquiring whether Medallion could develop a pet-stain-removal product that could be sold for less than $20.00 per bottle. After substantial market research and testing, Medallion contacted the NPI Defendants and advised them that it had developed a

-2-

preliminary prototype product and product label. Medallion provided samples of the product and the label to the NPI Defendants.

The product Medallion developed consisted of a proprietary solution in a spray bottle to be used with a blacklight with a specific ultraviolet setting that detected cat urine and other organic stains to be removed by the cleansing concentrate. Performance Chemicals supplied the original concentrate for this solution. The product prototype did not then contain enzymes because Medallion and Performance had not yet developed an enzyme-based product that could adequately perform and be sold to the NPI Defendants at a price low enough to meet the targeted retail price.

Performance Chemicals commissioned Envera to develop a formulation of enzymes that would interact with and chemically dissolve the organic materials in urine and other organic waste. Through the combined research, development, and creative efforts of Medallion, Performance, and Envera, a proprietary formulation of a solution was developed that could consume the organic material in the urine stain in such a way that the cleaning action could be demonstrated visually in a test tube through the use of the ultraviolet setting. Thus, the enzyme cleaning action of the solution could be demonstrated in a television infomercial. Performance agreed to buy the enzyme formulation from Envera, and Medallion agreed to buy the concentrate formulation from Performance for the life of the product.

In November 2004, Kroeger and Joseph Coligado, President of Performance, met with McAlister and Silbiger. McAlister introduced Silbiger as his business partner in a joint venture agreement they had reached by which their companies would divide markets, marketing costs, and revenues generated in the marketing of the Medallion product. Kroeger and Coligado presented their new product to McAlister and Silbiger; it had unique and valuable characteristics that made the

solution perform better than all other competing cleansers and permitted a visual demonstration of the effectiveness of the product. At this time, all the participants understood and agreed that the product and its proprietary applications were owned by Medallion.

Silbiger and McAlister informed Kroeger and Coligado that they wanted an exclusive agreement to market the product. Medallion agreed to participate in, and support, a marketing plan agreed to by the parties and to be the exclusive supplier of the product. The parties agreed that Medallion would sell the solution in sealed and labeled bottles together with a separate sprayer to McAlister's and Silbiger's companies by shipping those components to the Harriet Carter distribution center. Medallion further agreed to arrange the purchase of the ultraviolet blacklight that would be used to demonstrate the effectiveness of the cleaning solution with shipment directly from the blacklight manufacturer to the Harriet Carter distribution center. The bottled solution, sprayer, and blacklight would be assembled and boxed and shipped from the Harriet Carter distribution center. "This exclusive agreement was evidenced by the performance of the parties and confirmed in subsequent writings."

Some time after this meeting and December 8, 2004, unknown to Plaintiffs, McAlister and Specter entered into a plan with Silbiger to appropriate Plaintiffs' proprietary rights in the product for their own benefit. On December 8, 2004, in furtherance of the plan and unknown to Plaintiffs, Direct Response and H.C.T.V. entered into a joint venture agreement that excluded Plaintiffs and registered Direct Response and H.C.T.V. as co-applicants for trademark protection of the words "Urine Gone."

In December 2004, Medallion informed McAlister and Specter that it had test marketed the name "Urine You're Out" as a name for the proprietary urine-removing product. Specter and

McAlister told Medallion that they had entered into an agreement with Silbiger and H.C.T.V. and/or Harriet Carter to make a large investment into the marketing of Medallion's product and that they already filed an application for a trademark of the name "Urine Gone." Specter and McAlister re-confirmed that they wanted to proceed with Medallion to market the product on the basis that Medallion would supply its proprietary product exclusively to them and that they would market the product under the Urine Gone trademark. Based on what was then known to Medallion, Medallion agreed to proceed under the exclusive sales agreement for the sale of its product under the name "Urine Gone."

After entering into the agreement, Plaintiffs sent the proprietary product to an independent laboratory for testing. The results of the testing demonstrated the effectiveness of the biological cleaning agent through the activity of its proprietary formulation of enzymes.

Prior to February 2005, Broadcast Arts, Inc. was retained to produce the commercial (infomercial) that would be used to market the product. Representatives of Medallion and Performance attended and assisted in the production and taping of the infomercial.

The infomercial aired for the first time in early March 2005. The infomercial included a discussion of the enzyme action of the cleaning solution and the use of the blacklight to demonstrate the effectiveness of the cleaning solution. The infomercial ran very frequently from March through October 2005. During this time, the infomercial was twice ranked as the top rated infomercial. The infomercial continues to air and was included in the Urine Gone website. The success of the infomercial created a great demand for the product, which Medallion met. Medallion sold a total

of 3,338,000 units to H.C.T.V. from March through October 2005, with the final delivery in December 2005. H.C.T.V. re-sold most of those units to call-in purchasers responding to the infomercial.

At some point, H.C.T.V. stopped using Medallion's supplier of the blacklight and selected a new supplier. However, in selecting the new supplier, H.C.T.V. failed to verify that the substitute light had the appropriate radiance and ultraviolet rating to detect the presence of the organic stain. H.C.T.V. also filled some orders for Urine Gone with bottles of fake or counterfeit solutions supplied by ICC.

Prior to July 2005, in furtherance of the plan, NPI and/or Direct Response and/or Media Enterprises entered into an agreement with ICC to develop an aromatic cleaning solution that could be used to fill the Urine Gone labeled bottles and be passed off as the Plaintiffs' proprietary enzyme-acting cleaning solution "as seen on TV." By July 2005, the NPI Defendants were preparing to offer retail sales of Urine Gone. During this time and through October 2005, the NPI Defendants engaged in a series of acts that were intended to induce Plaintiffs into believing that NPI would honor its agreement to buy exclusively from Medallion. These acts included: placing small orders of the genuine product for use in sales demonstrations and to fill early sales orders, requesting that Medallion have NPI and Direct Response named as additional insureds/certificate holders on Medallion's policy of insurance, and requesting Medallion to develop related urine-cleaning wipes. McAlister also contacted Ghai to express his concern that because of the success of the product, Medallion might break the exclusivity agreement and try to market the product itself.

From March 2005 until August 2005, Harriet Carter also purchased small sample orders of Medallion's Urine Gone that it used as sales samples in the promotion of its catalog sales.

NPI and H.C.T.V. continued to market and sell a cleaning solution based on the infomercial and the scientific testing to verify the label claims. However, the cleaning solution that was delivered was a counterfeit solution manufactured by ICC. The cleaning solution manufactured by ICC was not accurately described by the label. Testing of the ICC cleaning solution found minimal to no enzyme activity.

Beginning in the Fall of 2005, Urine Gone was sold in the retail market but was not the same product as Plaintiffs' formulated solution offered for sale through the infomercial. However, the label stated that the product was the product "as seen on TV" and that it had enzyme action that did the cleaning. The counterfeit product was also sold with a blacklight. However, the blacklight was not the blacklight that had been previously tested to assure that it accurately demonstrated the cleaning effectiveness of the solution.

Also in the Fall of 2005, Medallion began receiving customer complaints regarding the performance of Urine Gone. The customers were calling Medallion because Harriet Carter advised dissatisfied customers who purchased the product through the catalog or Internet that Medallion was the manufacturer.

After Plaintiffs learned that that counterfeit product was being sold, Medallion sought to enter into an agreement with Emson, Inc., another developer of infomercial products. On March 13, 2006, a female Medallion employee was conducting a demonstration of Plaintiffs' cleaning solution at a trade show in the Emson booth. While viewing the demonstration, McAlister and Specter physically and verbally assaulted the Medallion employee. Prior to this incident, Emson had funded

the production of an infomercial for Plaintiffs' new product that was to be marketed as "Urine Away." Emson had also preliminarily indicated that it would fund the marketing of the new product. Following the incident at the trade show, Emson withdrew its support of the Urine Away product.

## ANALYSIS

### *Personal Jurisdiction over ICC*

ICC argues that it should be dismissed because the Court lacks personal jurisdiction over ICC. Plaintiffs argue that jurisdiction lies in this Court because ICC was part of the alleged conspiracy.

Fact pleading is not required to sufficiently plead a conspiracy claim. *See Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 713 (7th Cir. 2006) ( *Kolupa*). However, a Plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction; and factual allegations are required to establish personal jurisdiction under a conspiracy theory. *See Steel Warehouse of Wisc., Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998); *Textor v. Board of Regents of Northern Ill. Univ.*, 711 F.2d 1387, 1392-93 (7th Cir. 1983) (*Textor*); *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 696-97 (N.D. Ill. 2002) (*Kohler*).

Under the "conspiracy theory of jurisdiction," the Court may assert jurisdiction over all co-conspirators based on their involvement in a conspiracy that occurred within the forum. *See Textor*, 711 F.2d at 1392-93; *Kohler*, 196 F. Supp. 2d at 696-97. Under this theory, the plaintiff must: (1) make a *prima facie* showing of a conspiracy, identifying evidence showing the existence of the conspiracy and the defendant's knowing participation in the conspiracy; (2) allege specific facts warranting an inference that the defendant was a member of the conspiracy; and

-8-

(3) demonstrate that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in the forum. *See Textor*, 711 F.2d at 1393; *United Phosphorus, Ltd. v. Angus Chem. Co.*, 43 F. Supp. 2d 904, 912 (N.D. Ill. 1999). The evidence relating to the conspiracy may be circumstantial or direct, but merely alleging that a defendant participated in the conspiracy and another member of the conspiracy committed an unlawful act in the forum is inadequate to confer personal jurisdiction of a non-resident co-conspirator. *See Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 697 (N.D. Ill. 2002).

Here, Plaintiffs allege that the Defendants, including ICC, engaged in a common plan to market and produce a reformulated substandard version of Urine Gone while representing to the public that the Urine Gone sold in retail stores was the same product advertised and demonstrated on the infomercial. Plaintiffs allege that the Defendants carried out their plan by violating federal and state law. Allegations as to ICC are: that ICC and other Defendants made a decision to change the Urine Gone formulation from Plaintiffs' proprietary formulation to a counterfeit formulation and that ICC participated in the distribution of a Material Safety Data Sheet to all retail sellers that stated that citric acid was an active ingredient when testing indicated no presence of citric acid in either the original Urine Gone product or the counterfeit product.

Plaintiffs' minimal allegations as to ICC's participation in the alleged conspiracy fail to make a *prima facie* showing of a conspiracy because Plaintiffs have failed to identify evidence of the existence of the conspiracy and ICC's knowing participation in the conspiracy and have failed to allege specific facts warranting an inference that ICC was a member of the conspiracy. Plaintiffs have failed to demonstrate personal jurisdiction over ICC, as required by the above-discussed

heightened pleading requirement imposed on Plaintiffs to demonstrate such jurisdiction. *See Reserve Capital, LLC v. CLB Dynasty Trust 2002*, 2006 WL 1037321 (N.D. Ill. April 17, 2006) (plaintiff's minimal factual allegations were insufficient to demonstrate a *prima facie* showing for purposes of finding personal jurisdiction over defendant); *Plastic Film Corp. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1145-46 (N.D. Ill. 2001) (same).

Based on the above, the Court lacks personal jurisdiction over ICC; and ICC's Motion to Dismiss is granted.

### Remaining Defendants' Motion to Dismiss for Failure to State a Claim

The remaining NPI Defendants seek to dismiss all of Plaintiffs' claims based on numerous arguments.

In reviewing a motion to dismiss, the court considers all allegations in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir. 2000). A filing under the Federal Rules of Civil Procedure should be "short and plain," and it suffices if it notifies the defendant of the principal events. *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). A plaintiff is not required to plead the facts or the elements of a claim, with the exceptions found in Federal Rule of Civil Procedure 9 (Pleading Special Matters, *i.e.*, fraud, mistake, etc.). *See Swierkiewicz v. Sorema*, 534 U.S. 506, 511 (2002); *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 713 (7th Cir. 2006) (*Kolupa*). In other words, any movant "tempted to write 'this complaint is deficient because it does not

contain . . . .' should stop and think: What rule of law *requires* a complaint to contain that allegation?" *Kolupa*, 438 F.3d at 713 (quoting *Doe v. Smith*, 429 F.3d 706, 708 (7th Cir. 2005 )) (emphasis in original).

*Count I*

Count I alleges unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) on behalf of all three Plaintiffs against the NPI Defendants. Plaintiffs allege that the NPI Defendants manufactured and substituted a counterfeit solution and supplied the wrong blacklight under the name Urine Gone, despite the fact that the product was advertised as being the same product sold on television via the infomercial. Plaintiffs allege that NPI's sale of the counterfeit solution is a false representation that is likely to confuse the public.

The Lanham Act provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or devise, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. §1125(a)(1)(A), (B).

The NPI Defendants first argue that Plaintiffs cannot bring a Lanham Act claim for what is essentially a contract dispute between an exclusive licensee and a licensor over the right to use the

trademark, citing *Gruen Mktg. Corp. v. Benrus Watch Co.*, 955 F. Supp. 979 (N.D. Ill. 1997). However, the Lanham Act claim rejected in *Gruen* was brought under 15 U.S.C. § 1114(a)(a), which provides for a civil action against one who, without the consent of the registrant, uses a counterfeit, copy, or imitation of a registered trademark. Contrary to *Gruen*, Plaintiffs in the present suit have alleged a violation of 15 U.S.C. §1125(a).

The NPI Defendants also argue that Plaintiffs' Lanham Act claim should be dismissed because it cannot counterfeit their own product; therefore, as a matter of law, Plaintiffs' claim fails. As with the NPI Defendants' previous argument, the NPI Defendants interpret Plaintiffs' allegations as alleging confusion only on the basis of the trademark. However, Plaintiffs allege that the product sold by the NPI Defendants contains false or misleading descriptions of fact and/or false and misleading representations of fact that are likely to cause confusion and/or misrepresent the nature, characteristics and qualities of the product in their commercial advertising and promotion. A Section 1125(a) claim may be based on allegations other than the unauthorized use of a name/trademark. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999) (setting out the elements of Section 1125(a) based on the false or deceptive advertising prong of the Lanham Act as: (1) a false statement of fact in a commercial advertisement about its own or another's product, (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience, (3) the deception is material, (4) the defendant caused its false statement to enter interstate

commerce, and (5) the plaintiff has been or is likely to be injured because of the false statement); *cf. MJ & Partners Rest. Ltd. v. Zadikoff*, 10 F. Supp. 2d 922, 926-27 (N.D. Ill. 1998) (*Zadikoff*) (discussing Lanham claim based on alleged unauthorized use of a trademark).

Plaintiffs have sufficiently pled a claim under 15 U.S.C. § 1125(a).

### Counts II and III

Count II alleges a violation of the Illinois Uniform Deceptive Trade Practices Act ("IDTPA"), 815 ILCS 510/1 *et seq.*; and Count III alleges a violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFDTPA"), 815 ILCS 505/2.

The NPI Defendants seek dismissal of Counts II and III based on the dismissal of the Lanham Act claim. *See Zadikoff*, 10 F. Supp. 2d at 929 (legal inquiry under the IDTPA and ICFDTPA is the same as the legal inquiry under Lanham Act – IDTPA and ICFDTPA claims rise and fall based on the Lanham Act claim). Because Plaintiffs' Lanham Act claim survives, so do Counts II and III.

### Count IV

Count IV alleges a violation of the Illinois Trade Secret Act ("ITSA"), 765 ILCS 1065/1 et seq. The NPI Defendants argue the ITSA claim should be dismissed because the Plaintiffs have pled themselves out of the "misappropriation" element of the claim.

A violation of the ITSA occurs if the defendant misappropriates a secret in its business. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir. 1992). "Misappropriation" is defined in the act as:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I) derived from or through a person who utilized improper means to acquire it;

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2(b). The NPI Defendants read Plaintiffs' allegations too narrowly. Based on the allegations in the Second Amended Complaint as set out above, Plaintiffs have sufficiently pled a ITSA claim and have not "pled themselves out of court."

*Count V*

Count V alleges a breach of contract claim against the NPI Defendants[1] based on H.C.T.V. and NPI's failure to purchase the proprietary formulation exclusively from Medallion.

The NPI Defendants argue that, based on their interpretation of the allegations and the failure of Plaintiffs to attach a copy of the contract, no contract exists. Therefore, Plaintiffs' breach of contract claim fails and/or is barred by the statute of frauds. Again, the NPI Defendants read Plaintiff's Second Amended Complaint too narrowly and only draw selective inferences that support their arguments. Plaintiffs pled that written evidence of the contract exists and that the NPI

---

[1]Plaintiffs concede that the individual Defendants, McAlister, Specter, and Silbiger should be dismissed from Count V. Accordingly, these Defendants are dismissed as to Count V.

Defendants breached the contract. Plaintiffs need not plead facts sufficient to defeat any of the multiple grounds that may be detrimental to a contract claim, *i.e.*, statute of frauds defense or terminable at-will contract. *See Kolupa*, 438 F.3d at 713.

*Count VI*

Count VI alleges a claim for fraudulent inducement. Plaintiffs allege that the NPI Defendants intentionally made false representations to induce the Plaintiffs to believe that they had an exclusive agreement, thereby causing Plaintiffs to sell exclusively to the NPI Defendants during the crucial developmental phase of the marketing plan.

The NPI Defendants first argue that Count VI is barred by the economic loss doctrine, also known as the Moorman Doctrine. Generally, a plaintiff may not recover in tort for purely economic losses arising from misrepresentations in the sale of goods. *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982) (*Moorman*). The *Moorman* court recognized two exceptions to the rule, intentional misrepresentations or when the defendant is in the business of supplying information. *Moorman*, 91 Ill. 2d at 82. Plaintiffs specifically pled that the NPI Defendants made intentional misrepresentations. Count VI, as pled, meets one of the recognized exceptions.

The NPI Defendants also argue that Plaintiffs failed to plead their fraudulent inducement claim with specificity.

Federal Rule of Civil Procedure 9(b) requires a plaintiff plead the circumstances constituting fraud with particularity. "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Contrary to the NPI Defendants' argument, Plaintiffs have sufficiently pled their fraudulent inducement claim as required by Rule 9(b). Plaintiffs' Second Amended Complaint sets forth specific dates, meetings, people, events, and statements and conduct that allegedly constitute fraudulent inducement.

## Count VII

Count VII alleges a claim for unjust enrichment based on the NPI Defendants' alleged misappropriation of the Plaintiffs' research, product development, contribution, and substantive content to the production of the infomercial. The NPI Defendants argue that Plaintiffs did not, and cannot, plead facts supporting the required "conferring of a benefit" element of an unjust enrichment claim. Plaintiffs need not plead facts in support their claim. *See Kolupa*, 438 F.3d at 713 ("It is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date) that will let the defendant investigate.").

## Count VIII

Count VIII alleges a claim for tortious interference with prospective business advantage based on McAlister and Specter's conduct at the trade show and Emson's subsequent withdrawal of support of Plaintiff's product. The NPI Defendants argue that Count VIII should be dismissed because, as the owners of the Urine Gone trademark, their conduct was privileged as a matter of law because they were simply acting to protect their recognized property interest by their conduct at the trade show. *See HPI Health Care Serv, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 157 (1989) (privilege recognized where the defendant acts to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights). Furthermore, the NPI Defendants argue

that Plaintiffs fail to allege any facts to overcome the privilege. Again, Plaintiffs need not plead these facts nor can Count VIII be dismissed based on an alleged defense of privilege.

*Count IX*

Count IX alleges Harriet Carter defamed Medallion, *per se*, by telling dissatisfied customers of its counterfeit product that Medallion had manufactured the complained of product. Harriet Carter first argues that Count IX should be dismissed because Medallion failed to allege facts to meet the damages element of a defamation claim. Medallion need not plead facts or the elements of a claim. Harriet Carter next argues that Count IX is impermissibly vague. However, the allegations in Count IX sufficiently put Harriet Carter on notice of the claim against it. *See* Fed. R. Civ. P. 8(a). Harriet Carter also argues that Medallion's defamation claim fails because Medallion only alleges libel by omission – that Harriet Carter concealed that the product was the counterfeit formulation. However, a reading of all of the allegations as to the defamation claim clearly demonstrates that Medallion is basing its defamation claim on statements Harriet Carter made to the dissatisfied customers, not by failing to tell the customers that the product was not the original Urine Gone product.

*Count X*

Count X alleges a conspiracy claim against all Defendants.[2]

Defendants argue that Count X should be dismissed because Plaintiffs failed to allege an overt act or acts that violate an established right or law. Contrary to Defendants' argument,

---

[2]As discussed above, ICC is dismissed for lack of jurisdiction.

-17-

Medallion has pled conduct by the Defendants that violates federal and state law. In essence, Defendants seek to dismiss the conspiracy claim based on their argument that the alleged violations fail to constitute a violation of federal or state law. This argument goes to the merits of Plaintiffs' claims and are not properly addressed at this stage of the litigation.

### Other Arguments for Dismissal

The NPI Defendants argue that Performance and Envera lack standing to bring any claims.

A party has standing under the Lanham Act if it "has a reasonable interest to be protected against conduct violating the Act." *Dovenmuehle v. Gildorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989). A party must also assert "a discernable competitive injury" if it is alleging a false advertising claim. *L.S. Heath & Son, Inc. v. AT & T Info. Sys. Inc.*, 9 F.3d 561, 575 (7th Cir. 1993).

Plaintiffs' Second Amended Complaint alleges that Performance and Envera were involved in the formulation of the original Urine Gone product and that all three Plaintiffs have a proprietary interest in the product. Furthermore, it is alleged that all three Plaintiffs are involved in attempting to manufacture and launch a product that will directly compete with the original Urine Gone product. All Plaintiffs have sufficiently alleged standing under the Lanham Act (and the IDTPA and ICFDTPA). *See Zadikoff*, 10 F. Supp. 2d at 929. Similarly, Plaintiffs have sufficiently pled Performance and Envera's standing as to the remaining claims.

Defendants, Specter and McAlister, argue that the individual claims against them should be dismissed because Plaintiffs fail to plead sufficient facts to support the allegations that they ever acted on their own behalf. Plaintiffs need not plead facts. In addition, the Second Amended

Complaint contains numerous details of Specter and McAlister's conduct along with allegations that such conduct was performed on both the corporations' and their own behalf.

Defendant Silbiger argues that the individual claims against him should be dismissed because Plaintiffs only allege that Silbiger is an employee of H.C.T.V. and Plymouth Direct. However, as admitted in Defendants' brief, Plaintiffs alleged that Silbiger is also an "officer" of H.C.T.V. and Plymouth Direct.

Lastly, as to the NPI Defendants, they argue that the Second Amended Complaint should be dismissed because Plaintiffs plead several claims against the NPI Defendants collectively. While some of Plaintiffs' claims are pled collectively, the Second Amended Complaint contains numerous allegations setting out particular conduct as to each Defendant. Furthermore, many of the individual Defendants worked with/for several of the corporate Defendants at the same time; accordingly, discovery will allow the parties to specifically identify the parties' conduct. The Second Amended Complaint sufficiently notifies the Defendants of the Plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, ICC's Motion to Dismiss is granted. ICC is dismissed for lack of personal jurisdiction. The remaining Defendants' Motion to Dismiss is denied. By agreement of the parties, Defendants, McAlister, Specter, and Silbiger, are dismissed from Count V.

Dated: _October 24, 2006_

JOHN W. DARRAH
United States District Court Judge

-19-