# EXHIBIT "1"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDALLION PRODUCTS, INC., ENVERA, LLC, and PERFORMANCE CHEMICALS, <br><br> Plaintiffs-Counterclaim Defendants, <br><br> v. <br><br> H.C.T.V., INC., PLYMOUTH DIRECT, INC., HARRIET CARTER GIFTS, INC., NATURE'S PILLOWS, INC., DIRECT RESPONSE, INC., MEDIA ENTERPRISES II, INC., d/b/a MEDIA ENTERPRISES, INC., BILL McALISTER, BRAD SPECTER, STEVE SILBIGER, INNOVATIVE CHEMICALS CORPORATION, WOODRIDGE SPECIALTY PRODUCTS CORPORATION, JAMES TIMLIN and THE BROADCAST ARTS GROUP, INC. <br><br> Defendants-Counterclaim Plaintiffs, | Case No. 06 C 2597 <br><br> Judge John W. Darrah <br><br> Magistrate Judge Geraldine Soat Brown |

## DECLARATION OF JOHN MILLER

1. My name is John Miller. I am the Vice President of The Broadcast Arts Group, Inc. ("Broadcast Arts").

2. Broadcast Arts' principal place of business is in Deerfield Beach, Florida. Broadcast Arts is incorporated under the laws of Florida.

3. None of Broadcast Arts' shareholders are resident in or citizens of Illinois.

4. None of the members of Broadcast Arts' Board of Directors are resident in or citizens of Illinois.

-1-

5. Broadcast Arts has no offices in Illinois.

6. Broadcast Arts owns no property in Illinois.

7. Broadcast Arts has no telephone listings in Illinois.

8. Broadcast Arts has no employees in Illinois.

9. Broadcast Arts has no bank accounts in Illinois.

10. Broadcast Arts does not sell any goods or services directly to Illinois customers.

11. I am familiar with the infomercial regarding the Urine Gone® product that is the subject of the Third Amended Complaint ("the Infomercial"). The Infomercial was filmed entirely in the State of Florida. At no time, in connection with the Infomercial, did any Broadcast Arts employee travel to Illinois.

12. Broadcast Arts executed a Production Agreement for the production of the Infomercial. Broadcast Arts entered into this agreement solely with Direct Response, Inc. and H.C.T.V., Inc., both of which Broadcast Arts believes to be Pennsylvania companies. See Production Agreement, attached hereto as Exhibit A. At no time did Broadcast Arts enter into any agreement with any Illinois company concerning Urine Gone® or the Infomercial.

13. All bills for the Infomercial were paid entirely by H.C.T.V. Inc. and/or Direct Response, Inc.

14. At no time did Broadcast Arts ever have any type of commercial relationship with Medallion, which did not engage Broadcast Arts, nor did it pay for any portion of the Infomercial.

15. After the completion of the Infomercial in Florida, Broadcast Arts provided the Infomercial to a company located in the State of Montana, North Country

Duplication, Inc. ("North Country"), which thereafter, to my knowledge, placed the Infomercial for broadcast through various broadcast and network outlets.

16. Broadcast Arts' relationship with North Country, in which North Country operates as a duplication service provider, was concluded between the two parties in, respectively, Florida and Montana. Illinois had no connection with this relationship.

17. After Broadcast Arts provided the Infomercial to North Country in Montana, Broadcast Arts had no further connection with the Infomercial. Broadcast Arts neither knew, nor played any role in, the placement of the Infomercial in the broadcast and network outlets. If the Infomercial was played in Illinois, Broadcast Arts had no role in that decision or its execution.

18. Broadcast Arts receives a royalty stream as a result of sales of Urine Gone®. This royalty stream is provided for in the Production Agreement. Broadcast Arts is a passive recipient of this income. Other than receiving royalties, Broadcast Arts is not involved in any manner with the Urine Gone® product. Broadcast Arts plays no role in the decisions or the execution of any decisions regarding the product, including where to sell the product.

19. No Broadcast Arts employee has traveled to Illinois in connection with the Urine Gone® product.

20. At no time did I, or any employee of Broadcast Arts, even hear of the entities Performance Chemicals, Inc. or Envera LLC in connection with the Infomercial or Urine Gone®, let alone contract with them.

I declare under penalty of perjury that the above information is true and correct.

Dated: May 25, 2007

JOHN MILLER

-4-

# EXHIBIT
# "A"

# PRODUCTION AGREEMENT
## "Urine Gone"

THIS PRODUCTION AGREEMENT ("Agreement") is dated as of November 22, 2004 and is among THE BROADCAST ARTS GROUP, INC., a Florida corporation ("BAG"), H.C.T.V., Inc., a Pennsylvania corporation ("HCTV"), and DIRECT RESPONSE, INC., a Pennsylvania corporation ("DRI," and collectively with HCTV, "Client").

The parties wish to set forth the terms and conditions under which Client will engage BAG to render certain television production services, as more particularly set forth below. Accordingly, in consideration of the mutual promises and undertakings set forth herein, and intending to be legally bound hereby, the parties agree as follows:

1. <u>Services</u>.

   (a) <u>Generally</u>. Client hereby engages BAG to produce a direct response television commercial in 120-second and 60-second versions for the purpose of advertising and marketing a product known (or to be known) as "Urine Gone". The foregoing television commercial (and all versions thereof) shall individually and collectively be referred to herein as the "Commercial." The foregoing product, all components thereof and accessories thereto and all other goods and services that are advertised and marketed by means of the Commercial shall individually and collectively be referred to herein as the "Product."

   (b) <u>Production Duties</u>. BAG shall develop the creative concept for the Commercial and submit it to Client for approval. Once the parties have agreed on the creative concept for the Commercial, BAG shall be responsible for all pre-production, production and post-production services reasonably required to complete the Commercial in accordance with such creative concept, including, without limitation, scripting, producing, directing and editing. Except as the parties may otherwise expressly agree in writing, BAG shall be responsible for obtaining testimonials in support of the Product to be incorporated in the Commercial and obtaining such affidavits, releases and other grants of permission (collectively, "Documentation") as Client may reasonably require (on Client-supplied forms) in connection with the use of such testimonials in the Commercial. BAG shall not be responsible for securing the appearance or paying any fees or expenses of a host, demonstrator or any other talent in the Commercial, unless the parties otherwise expressly agree in writing.

   (c) <u>Disclaimers</u>.

      (1) The services contemplated hereby shall not include customization of the Commercial to include toll-free order numbers and screens or storage of tapes following delivery of the completed Commercial to Client hereunder.

      (2) Absent mutual agreement of the parties, BAG shall have no responsibility hereunder or otherwise to render services to revise the Commercial in accordance with a creative approach substantially different from that to which the parties initially agree under Section 1(b) hereof.

      (3) Client acknowledges that BAG is neither a designer, manufacturer nor reseller of the Product, either by itself or in participation with any other person or entity, and BAG therefore makes no representation, warranty, endorsement or certification regarding the effectiveness, quality, character or fitness of any Product.

      (4) BAG shall perform the services contemplated hereby to the best of its abilities. Nonetheless, BAG makes no guarantee that the Commercial will result in sales of the Product in amounts satisfactory to Client.



BAG/HCTV-DRI(MAF)112204    **CONFIDENTIAL**    NP00176

2. <u>Production Budget</u>.

(a) <u>Generally</u>. The production budget for the Commercial shall be $26,500 (the "Production Budget"). The Production Budget shall include those expenses incurred in connection with the services to be rendered by BAG in accordance with Section 1 hereof, but shall not include (i) the costs of any additional services which BAG may agree to perform in connection with the Commercial or (ii) the fees or expenses of any host, demonstrator or other talent engaged by Client to appear in the Commercial.

(b) <u>Disbursement</u>. Client shall disburse the Production Budget to BAG in accordance with the following schedule:

(1) one-third upon the execution of this Agreement;

(2) one-third upon notice by BAG that it intends within 15 days to commence principal shooting of the Commercial; and

(3) one-third upon BAG's delivery of Viewing Copies (as defined in Section 3(a) hereof).

(c) <u>Overages</u>. Client shall be responsible for all costs in excess of the Production Budget which result from any changes in the scope of the production or services which are requested by Client and agreed to by BAG.

3. <u>Delivery</u>.

(a) <u>Generally</u>. Upon completion of production, BAG shall deliver three VHS copies of the Commercial which are complete in all respects except for customized ordering screens (the "Viewing Copies") to Client in exchange for the final payment of the Production Budget, as required pursuant to Section 2(b)(3) hereof. Upon payment in full of the Production Budget, BAG shall deliver to Client one Beta SP duplication master of the completed Commercial (the "Master") and all Documentation contemplated by Section 1(b) hereof.

(b) <u>Delivery Conditioned on Payment</u>. Client expressly acknowledges that BAG shall have no duty to deliver the Master, the Documentation or any other footage or materials created in connection with services rendered hereunder to Client until such time as Client shall have paid the Production Budget in full, as required pursuant to Section 2(b) hereof.

4. <u>Royalties</u>.

(a) <u>Royalties on Sales by Client and its Affiliates</u>. In consideration of the services to be provided by BAG hereunder, Client shall pay royalties to BAG at the rate(s) specified in Schedule 1 hereto on Adjusted Gross Revenues (as defined in Section 4(c) hereof) from all worldwide sales made by Client and its affiliates of the Product and all other goods packaged or otherwise offered together with the Product (collectively, "Royalty-Bearing Goods") by all means and media (including those made on an upsell and continuity basis), whenever made. For purposes of this Agreement, (i) sales made on an "upsell" basis shall mean sales of additional Royalty-Bearing Goods beyond the basic Product offering to customers who order in direct response to airings of the Commercial or any other marketing solicitation for the Product, and (ii) sales made on a "continuity" basis shall mean sales of additional supplies of Royalty-Bearing Goods to existing purchasers of the Product after their initial purchase thereof.

(b) <u>Royalties on Sales by Unsupplied Licensees</u>. Client shall also pay BAG royalties at the rate specified in Schedule 1 hereto on all worldwide sales, whenever made, of Royalty-Bearing Goods by third-parties to whom Client (or any of its affiliates) licenses or sublicenses the Product and/or the Commercial but who obtain their supplies of Royalty-Bearing Goods from a supplier other than Client or any of its affiliates ("Sales by Unsupplied Licensees").

(c) "Adjusted Gross Revenues" Defined. For purposes of this Agreement, "Adjusted Gross Revenues" shall mean collections of the following monies by Client and its affiliates from sales of Royalty-Bearing Goods:

(1) the retail selling price in the case of all sales by Client and its affiliates directly to consumers who order (i) in response to airings of the Commercial via a toll-free telephone number or the Internet or (ii) otherwise in direct response (i.e., without an intervening wholesaler or retailer) to an advertising solicitation, including, without limitation, print advertisements, direct mail advertisements, package inserts, telemarketing, Internet websites and other online solicitations ("Direct Response Sales");

(2) the wholesale selling price in the case of all sales by Client and its affiliates (i) into traditional retail channels of distribution, (ii) to televised home shopping retailers such as QVC and Home Shopping Network, (iii) to catalog merchants, (iv) otherwise to third-party wholesalers, retailers or licensees, or (v) by means and media other than those specifically listed herein ("Non-DR Sales"); and

(3) all royalties and other fees received by Client and its affiliates in the case of Sales by Unsupplied Licensees,

less refunds, credits, chargebacks and other allowances to customers on account of return or rejection of goods or otherwise granted in the ordinary course of business. Adjusted Gross Revenues shall not include shipping and handling charges and sales, use, VAT and other applicable taxes.

(d) Remittance and Reporting. Within 30 days following the end of each calendar month Client shall (i) pay BAG all royalties payable hereunder on collections made during such month and (ii) deliver to BAG a detailed written statement itemizing sales and collections made during such month and setting forth its calculations of the royalties payable to BAG thereon. All monetary amounts shall be expressed in United States Dollars.

5. Record Keeping; Audit. During the term of this Agreement and for at least one year thereafter, Client shall cause complete and accurate records to be kept of all sales which are subject to payment of royalties hereunder. Client shall make all such records available for inspection and audit by BAG (or its designee) at BAG's expense during normal business hours upon five business days prior notice; provided, however, that if any such audit shall show underpayment of amounts due hereunder from Client to BAG by more than 5% of the total amount actually due, Client shall bear the cost of such audit and shall promptly remit to BAG the entire amount of such underpayment.

6. Client's Responsibilities.

(a) Legal Compliance. Client shall be and remain solely responsible to ensure that (i) all information contained in the Commercial is accurate, (ii) all claims made in the Commercial are properly substantiated and (iii) the Commercial otherwise complies with all applicable laws and regulations relating to the advertisement and sale of the Product ("Applicable Law"). Client shall engage legal counsel for such purpose and shall be solely responsible for the fees, costs and expenses of such counsel. BAG shall follow such directives as Client may reasonably impose in order to assure that the Commercial complies with Applicable Law.

(b) Product Samples and Information. Client shall, without charge, supply BAG with such Product samples and other materials and information regarding the Product as BAG may reasonably require in order to produce the Commercial as contemplated hereby.

(c) Approvals. In all instances in which Client's approval is required hereunder, Client shall endeavor to notify BAG of its approval or disapproval within two business days after the matter in question is submitted to Client. Any notice of disapproval shall include, without limitation, an explicit statement of Client's reasons for disapproval. Approvals may not be unreasonably withheld, delayed or conditioned. Client will be deemed to have given any requested approval if it does not notify BAG of its disapproval within such two-business-day period. BAG shall not be liable or otherwise responsible for any delays in the production caused

BAG/HCTV-DIRI(MAF)112204                -3-                **CONFIDENTIAL**

NP00178

by delay in receiving any requested approval from Client. Moreover, Client shall be responsible for all additional costs not included in the Production Budget which directly result from any delay in receiving any requested approval.

7. <u>Intellectual Property Rights</u>. Subject only to Client's obligations to pay the Production Budget and royalties as set forth in Sections 2 and 4 hereof, Client shall hold the right to all results and proceeds of the services to be rendered by BAG hereunder. To that end, BAG acknowledges that the results and proceeds of the services which it is to render hereunder have been specially ordered and commissioned by Client as a "work made for hire" (as defined by Section 101 of the U.S Copyright Act) for the sole and exclusive benefit of Client. As to any such results and proceeds which, under applicable law, cannot be considered a work made for hire, BAG shall assign exclusive ownership of all United States and international copyrights therein to Client. BAG shall (and shall cause its personnel to) confirm such assignment by execution and delivery of such assignments, confirmations or assignment, or other written instruments as Client may reasonably request from time to time, subject to Client's payment of any legal fees and costs reasonably incurred by BAG in connection therewith. The consideration for all such assignments and actions shall be deemed to have been calculated and included in the compensation payable by Client hereunder.

8. <u>Representations and Warranties</u>.

   (a) <u>Generally</u>. Each of the parties represents and warrants to the other as follows:

   (1) It has all requisite power and authority (corporate and otherwise) to enter into this Agreement and perform its obligations hereunder and has duly authorized by all necessary action the execution and delivery hereof by the officer or individual whose name is signed on its behalf below.

   (2) Its execution and delivery of this Agreement and the performance of its obligations hereunder do not and will not conflict with or result in a breach of or a default under its respective organizational instruments or any agreement, instrument, order, law, or regulation applicable to it or by which it may be bound.

   (3) This Agreement has been duly and validly executed and delivered by it and constitutes its valid and legally binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by laws of bankruptcy or insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights and except as enforcement is subject to general equitable principles.

   (b) <u>Ownership and Authority</u>. Client represents and warrants that it solely owns or otherwise controls all right, title and interest in and to the Product and has all power, licenses, clearances and other authorizations necessary in order to (i) market and distribute the Product as contemplated hereby, (ii) engage BAG to produce the Commercial for that purpose and (iii) incorporate into the Commercial all trademarks and copyrighted materials which it has directed BAG to so incorporate.

9. <u>Term and Termination</u>.

   (a) <u>Term</u>. This Agreement shall remain in effect unless and until terminated in accordance with the provisions of Section 9(b), (c) or (d) hereof.

   (b) <u>Termination by Client</u>. If Client elects to discontinue its efforts to market and distribute the Product Client may terminate this Agreement on notice to BAG. In such case:

   (1) BAG may retain all Production Budget funds paid by Client through the date of such termination;

   (2) Client shall remain obligated to pay or reimburse (as the case may be) all production expenses in excess of the funds retained under clause (1) above which BAG has reasonably

incurred (as well as those for which it has entered into non-cancelable commitments) through the date of such termination; and

(3) Client shall pay BAG a cancellation fee equal to 20% of the Production Budget to compensate BAG for reserving a spot in its schedule to produce the Commercial and foregoing other business.

If, notwithstanding any such termination, Client subsequently resumes its efforts to market and distribute the Product and uses the Commercial or any other footage or materials prepared by BAG hereunder in connection therewith, then Client shall remain liable to pay royalties to BAG in accordance with the provisions of Section 4 hereof.

(c) <u>Termination by Client Upon Election Not to Roll Out Commercial</u>. If Client elects to discontinue airing the Commercial after an initial period of test airings not exceeding 45 days, then Client may terminate this Agreement on notice to BAG. In such case, Client shall be liable to pay royalties to BAG only on sales made through the date of such termination. If, however, Client subsequently resumes any airings of the Commercial, then Client shall be and remain liable to pay royalties to BAG in accordance with the provisions of Section 4 hereof (provided, however, that Client may allow excerpts from the Commercial to be aired on televised home shopping programming such as that aired by QVC and HSN without any obligation to pay royalties to BAG hereunder).

(d) <u>Termination Upon Material Breach</u>. Upon the material breach by either party of any of its representations, warranties, covenants or agreements contained in this Agreement, the other party may terminate this Agreement upon 30 days written notice setting forth the particulars of such breach. Upon the expiration of such notice period (and any extension thereof to which the parties may mutually agree), this Agreement shall terminate without the need for further action by either party; provided, however, that if the breach upon which such notice of termination is based shall have been fully cured to the reasonable satisfaction of the nonbreaching party within such 30-day period, then such notice of termination shall be deemed rescinded, and this Agreement shall be deemed reinstated and in full force and effect. Such right of termination shall be in addition to such other rights and remedies as the terminating party may have under applicable law.

10. <u>Indemnification</u>.

(a) <u>Indemnification by Client</u>. Subject to Section 10(c) hereof, Client shall defend, indemnify and hold harmless BAG, its affiliates and their respective officers, directors, shareholders, employees, licensees, agents, successors and assigns from and against any and all Liabilities (as defined herein) which any of them may incur or become obligated to pay arising out of or resulting from (i) the airing of the Commercial (including, without limitation, Liabilities arising from any violation or alleged violation of Applicable Law); (ii) the marketing, sale, use or shipment of the Product or any other goods marketed or distributed with or in connection with the Product (including, without limitation, Liabilities arising from personal injuries and property damage); (iii) the infringement (or alleged infringement) by the Product of any third-party proprietary rights or (iv) Client's breach of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement or negligence, recklessness or intentional misconduct.

(b) <u>Indemnification by BAG</u>. Subject to Section 10(c) hereof, BAG shall defend, indemnify and hold harmless Client, its affiliates and their respective officers, directors, shareholders, employees, licensees, agents, successors and assigns from and against any and all Liabilities (as defined herein) which any of them may incur or become obligated to pay arising out of or resulting from BAG's breach of any of its representations, warranties, covenants, obligations, agreements or duties under this Agreement or negligence, recklessness or intentional misconduct.

(c) <u>Exceptions</u>. Notwithstanding anything to the contrary contained herein, neither party shall have any obligation to indemnify, defend or hold harmless hereunder with respect to any Liabilities arising out of or resulting from the breach by the other party of any of its representations, warranties, covenants,

obligations, agreements or duties under this Agreement or any negligence, recklessness or intentional misconduct by the other party.

(d) "Liabilities" Defined. For purposes of this Agreement, "Liabilities" shall mean any and all claims of and liabilities to third parties and expenses incurred in connection therewith, whether or not in connection with proceedings before a court, arbitration panel, administrative agency, hearing examiner or other tribunal, and including, without limitation, damages (whether direct, consequential, incidental, or punitive), judgments, awards, fines, penalties, settlements, investigations, costs, and attorneys fees and disbursements.

(e) Procedure. Promptly after learning of the occurrence of any event which may give rise to its rights under the provisions of this section, each indemnitee hereunder shall give written notice of such matter to the indemnitor. The indemnitee shall cooperate with the indemnitor in the negotiation, compromise and defense of any such matter. The indemnitor shall be in charge of and control such negotiations, compromise and defense and shall have the right to select counsel with respect thereto, provided that the indemnitor shall promptly notify the indemnitee of all developments in the matter. Without releasing any liability, obligation or undertaking of the indemnitor, the indemnitee may, at its sole discretion and expense, participate in any such proceedings through counsel of its own choosing. Except as otherwise expressly provided below, the indemnitor may not, without the prior written consent of the indemnitee, enter into any compromise or settlement of any such matter the terms of which (i) are not confidential, (ii) in any way admit the indemnitee's liability or (iii) require the indemnitee to take or refrain from taking any action or make any payment; and the indemnitee shall not be bound by any such compromise or settlement absent its prior consent. The preceding sentence shall not apply in any case in which the indemnitor fails or refuses to assume the defense of any matter as to which its indemnity obligations apply (whether or not litigation has formally been instituted). In any such case, the indemnitor shall be responsible for any compromise or settlement thereof reached by the indemnitee and all Liabilities attendant thereto.

11. Insurance. Client shall, at its sole expense, obtain and maintain comprehensive product liability insurance with regard to the Product covering occurrences during the period in which Client airs the Commercial and for at least three years thereafter, regardless of when claims are made with respect to such occurrences. Such insurance shall be provided by one or more reputable and well-recognized insurance providers in an amount and of a kind reasonably satisfactory to BAG. Client shall cause BAG to be added as an additional named insured, as its interest may appear, on each such policy of insurance. Client shall furnish BAG with a certificate of insurance with respect to each such policy evidencing its terms of coverage. Each such certificate of insurance shall provide for at least 30 days' written notice to BAG prior to cancellation, termination, nonrenewal or any other material change or modification in the terms of coverage. All such insurance policies shall be written as primary coverage and not contributing with or in excess of any coverage that BAG may carry.

12. Confidentiality. Client shall treat as confidential all information regarding BAG's compensation hereunder ("Confidential Information"). Without BAG's prior written consent, Client may neither disclose nor otherwise disseminate any Confidential Information to any person or entity other than those of its officers, employees and agents who require it in order to perform Client's obligations under this Agreement. Moreover, Client may not use any Confidential Information for any purposes other than those contemplated by this Agreement. Notwithstanding the foregoing, Client may, upon prior notice to BAG, disclose Confidential Information to the extent required by applicable law or an order of a court of competent jurisdiction.

13. Joint and Several Liability. HCTV and DRI shall be jointly and severally responsible and liable for all of the obligations of Client hereunder.

14. Independent Contractor. The relationship created by this Agreement shall be that of independent contractor, and neither BAG nor any of its employees or subcontractors shall be considered an employee or agent of Client or any of its affiliated companies for any purpose whatsoever.

15. <u>Force Majeure</u>. Neither party shall be responsible for any delay or failure to perform any part of this Agreement to the extent that such delay or failure is caused by fire, flood, explosion, war, strike, labor unrest, riot, embargo, act of governmental, civil or military authority, accident, inability to obtain raw materials or supplies of the Product, acts or omissions of carriers, act of God, or other such contingencies beyond its control. Notice with full details of any such event shall be given to the other party as promptly as practicable after its occurrence. The affected party shall use due diligence, where practicable, to minimize the effects of or end any such event so as to facilitate the resumption of full performance hereunder.

16. <u>Miscellaneous</u>.

(a) <u>Notices</u>. All notices, requests, instructions, consents and other communications to be given pursuant to this Agreement shall be in writing and shall be delivered either in person or by U.S. Postal Service or reliable overnight courier service. Notices may also be transmitted by facsimile or electronic mail, provided that proper arrangements are made in advance to facilitate such communications and provide for their security and verification. Notices shall be sent to the following addresses:

| **If to BAG:** | **If to HCTV:** | **If to DRI:** |
|---|---|---|
| The Broadcast Arts Group, Inc. | H.C.T.V. Inc. | Direct Response, Inc. |
| 3191 SW 11th St, Bldg. 400 | 425 Stump Road | 2607 Interplex Drive |
| Deerfield Beach, FL 33442 | Montgomeryville, PA 18936 | Trevose, PA 19053 |
| Attention: Derek Schwartz, President | Attention: Steve Silbiger | Attention: Bill McAlister |
| FAX: 954-480-6169 | FAX: 215-361-5100 | FAX: 215-633-9858 |
| E-mail: Derekbagtv@attglobal.net | E-mail:silbiger@cs.com | E-mail: billm@atx.net |

Each party may by written notice given to the other(s) in accordance with this Agreement change the address to which notices to such party are to be delivered. Notices shall be deemed received (i) on the same day if delivered in person or by same-day courier, facsimile or electronic mail, (ii) on the next business day if delivered by overnight mail or courier, or (iii) on the date indicated on the return receipt, or if there is no such receipt, on the seventh business day if delivered by postal service, postage prepaid.

(b) <u>Entire Agreement</u>. This Agreement contains the complete, entire and exclusive statement of the parties' understanding with respect to its subject matter and supersedes all prior and contemporaneous agreements and understandings, whether written or oral, between them with respect to such subject matter. Each party has executed this Agreement without reliance upon any promise, representation or warranty other than those expressly set forth herein.

(c) <u>Amendment</u>. No amendment of this Agreement shall be effective unless embodied in a written instrument executed by all of the parties.

(d) <u>Waiver of Breach</u>. The failure of any party at any time to enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any provisions hereof or the right of any party hereto to thereafter enforce each and every provision of this Agreement. No waiver of any breach of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed by the party against whom or which enforcement of such waiver is sought; and no waiver of any such breach shall be construed or deemed to be a waiver of any other or subsequent breach.

(e) <u>Assignment</u>. Neither party may assign or subcontract this Agreement or any of its rights or obligations hereunder whether by operation of law or otherwise, without the prior written consent of the other party or parties, and any such attempted assignment without prior written consent shall be void and ineffective. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(f) <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal substantive and procedural laws of the State of Florida without regard to conflict

BAG:HCTV-DR (MAF)112204　　　　-7-　　　　**CONFIDENTIAL**

NP00182

of laws principles. The sole and exclusive venue for all disputes arising out of or relating in any way to this Agreement shall be the United States District Court for the Southern District of Florida and the 17th Judicial Circuit Court of Florida. The parties consent to the personal jurisdiction and venue of such courts and further consent that any process, notice of motion or other application to either such court or a judge thereof may be served outside the State of Florida by registered or certified mail or by personal service, provided that a reasonable time for appearance is allowed.

(g) <u>Severability</u>. All of the provisions of this Agreement are intended to be distinct and severable. If any provision of this Agreement is or is declared to be invalid or unenforceable in any jurisdiction, it shall be ineffective in such jurisdiction only to the extent of such invalidity or unenforceability. Such invalidity or unenforceability shall not affect either the balance of such provision, to the extent it is not invalid or unenforceable, or the remaining provisions hereof, nor render invalid or unenforceable such provision in any other jurisdiction.

(h) <u>Survival</u>. The following provisions shall survive the termination of this Agreement: Sections 2, 4, 5, 6, 7, 8, 9(b), 10, 11, 12, 13 and 16.

(i) <u>Interpretation and Construction</u>. This Agreement has been fully and freely negotiated by the parties hereto, shall be considered as having been drafted jointly by the parties hereto, and shall be interpreted and construed as if so drafted, without construction in favor of or against any party on account of its participation in the drafting hereof.

(j) <u>Headings</u>. The headings of sections and subsections have been included for convenience only and shall not be considered in interpreting this Agreement.

(k) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement. This Agreement may be executed and delivered via electronic facsimile transmission with the same force and effect as if it were executed and delivered by the parties simultaneously in the presence of one another.

(l) <u>Further Actions</u>. Each party shall, without further consideration, execute and deliver such additional documents and instruments and perform all such other and further actions as may be necessary or reasonably requested in order to carry out the purposes and intents of this Agreement.

(m) <u>U.S. Dollars</u>. Except as otherwise expressly set forth herein, all monetary amounts stated in this Agreement shall be deemed to be in United States Dollars.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their authorized officers on the date first written above.

THE BROADCAST ARTS GROUP, INC.
By: _____
Title: V.P. MARKETING

H.C.T.V., Inc.
By: _____
Title: Sr. Director of TV mktg.

DIRECT RESPONSE, INC.
By: _____
Title: President

BAG/HCTV-D III(MAF):12204    -8-    CONFIDENTIAL

NP00183

## SCHEDULE 1

Royalties shall be payable at the following rates:

**REDACTED**

**CONFIDENTIAL**