# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MEDALLION PRODUCTS, INC.;<br>ENVERA, LLC; and PERFORMANCE<br>CHEMICALS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 06 C 2597 |
| v. | ) ) | Judge John W. Darrah |
| H.C.T.V., INC.; PLYMOUTH DIRECT, INC.;<br>HARRIET CARTER GIFTS, INC.; NATURE'S<br>PILLOWS, INC.; DIRECT RESPONSE, INC.;<br>MEDIA ENTERPRISES II, INC.<br>d/b/a MEDIA ENTERPRISES, INC.;<br>BILL McALISTER; BRAD SPECTER;<br>STEVE SILBIGER;<br>INNOVATIVE CHEMICALS CORPORATION;<br>WOODRIDGE SPECIALTY PRODUCTS<br>CORPORATION; JAMES TIMLIN and<br>THE BROADCAST ARTS GROUP, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs filed a multi-count Complaint against Defendants, seeking injunctive relief and

monetary damages. In June 2006, Plaintiffs filed their Second Amended Complaint. In October

2006, this Court ruled that there was no basis to assert personal jurisdiction over Innovative

Chemicals Corporation ("ICC"); and the Second Amended Complaint was dismissed as to ICC.

Furthermore, by agreement of the parties, Defendants, Bill McAlister, Brad Specter, and

Steve Silbiger were dismissed from Count V of the Second Amended Complaint.

In April 2007, Plaintiffs filed a Third Amended Complaint. Presently before the Court are: the Defendant's, Broadcast Arts Group, Inc.'s ("Broadcast Arts"), Motion to Dismiss the Third Amended Complaint based on 12(b)(2); and Defendants', ICC, Woodridge Specialty Products Corporation ("Woodridge"), and James Timlin (collectively, "ICC Defendants"), Motion to Dismiss based on 12(b)(2) and 12(b)(6).

## BACKGROUND

A reading of the Third Amended Complaint supports the following summary of the alleged operative conduct of the parties.

Medallion Products, Inc. is engaged in the business of designing and marketing consumer products that are initially marketed in television infomercials with follow-up marketing of successful infomercial products to Internet, catalog, and retail outlets. Performance Chemicals, Inc. manufactures and sells chemical products. Envera, LLC provides biochemical, technical, and laboratory services, including the development and testing of biochemical agents.

H.C.T.V., Inc. and Plymouth Direct, Inc. are corporations engaged in marketing products on television and through other media forms. Neither H.C.T.V. nor Plymouth has any employees. Silbiger is the managing agent of both corporations. Harriet Carter Gifts, Inc. is engaged in the coordination, control, and facilitation of the sales and supply operations of H.C.T.V. and Plymouth and is in the sale of products, including Urine Gone, through catalogs that it operates and controls. Nature's Pillows, Inc. ("NPI"), Direct Response, Inc., and Media Enterprises II, Inc. are marketing companies involved in the multi-media marketing, distribution, and sale of consumer products designed by others. NPI, Direct Response, and Media Enterprises are owned, operated, and controlled by McAlister and Specter.

2

ICC is currently an inactive New York corporation with its principal place of business in Buffalo, New York. ICC continues to engage in the business of developing, manufacturing, selling, and certifying the accuracy of the content of the chemical products that it sells. Timlin is the owner and chief executive officer of ICC. Woodridge is a Delaware corporation with its principal place of business in New York. Woodridge and ICC operate out of the same facilities, conduct the same business, and have the same ownership and management. Broadcast Arts is a Florida corporation with its principal place of business in Deerfield Beach, Florida. Broadcast Arts produces infomercials.

In August or September 2004, McAlister contacted Monica Kroeger and Sheetal Ghai of Medallion, regarding development of a pet-stain-removal product. Medallion commissioned Performance and Envera to develop a formulation of enzymes that would interact with and chemically dissolve the organic materials in urine and other organic waste, that could be visually demonstrated on television, and that could be safely used as an ingredient in the product.

On October 28, 2004, Kroeger of Medallion and Joseph Coligado of Performance met with McAlister and Silbiger to discuss entering into an exclusive agreement to market the product. Medallion agreed to provide the product to companies to be designated by McAlister and Silbiger. Medallion was to serve as the exclusive supplier of the product. McAlister and Silbiger indicated the product would be promoted through a television commercial spot or a infomercial produced by Broadcast Arts. Silbiger was working with H.C.T.V., to whom Medallion would supply the product for direct response sales; and McAlister was working with

NPI, to whom Medallion would supply the product for retail sales if the direct response sales indicated a retail demand for the product. On November 19, 2004, Silbiger confirmed that Medallion would develop the bottle, sprayer, container, instructions, ingredient fill quantities, and samples and that Harriet Carter would complete the art work for the label.

Sometime between October 28, 2004 and November 22, 2004, McAlister and Specter entered into an oral agreement by which they arranged to share the responsibilities and costs of marketing and the profits generated from the sale of Medallion's product in a manner which would deprive Medallion of their proprietary rights in the product and their right to compensation for such use of its proprietary rights. On or about November 22, 2004, unknown to Medallion, McAlister, Specter, and Silbiger, through H.C.T.V. and Direct Response, represented to Broadcast Arts that they owned the proprietary right to the product. H.C.T.V. and Direct Response entered into a contract with Broadcast Arts by which Broadcast Arts agreed to produce the television infomercial that would be used to market the product. In return, Broadcast Arts received payment of production fees plus royalties on direct response sales and retail sales generated from the infomercial.

On December 8, 2004, Direct Response and H.C.T.V. registered the words "Urine Gone" in the Federal Patent Office as co-applicants for trademark protection of that name. In January 2005, Broadcast Arts began shooting the Urine Gone infomercial in its studio in Deerfield Beach, Florida. Kroeger and Coligado traveled to Deerfield Beach to attend the first two days of shooting with McAlister and Silbiger. In February 2005, the infomercial was completed and aired on television beginning in March 2005. From March through October 2005, the infomercial was heavily run.

4

In January 2005, prior to the airing of the infomercial, Specter and NPI, without Plaintiffs' knowledge, solicited ICC to enter into an agreement by which ICC would develop and supply a counterfeit cleaning solution to be used to fill the Urine Gone-labeled bottles and passed off as Plaintiffs' proprietary enzyme, acting as the product "As seen on TV." The agreement held that ICC would manufacture the counterfeit solution, sell it in retail stores, and hold it out to be the solution manufactured and tested by Medallion.

From March 3, 2005 to October 6, 2005, Medallion shipped 338,000 units of sealed and labeled 24-oz. bottled solution with sprayer to Harriet Carter pursuant to H.C.T.V.'s orders. Based on these sales, Harriet Carter and NPI decided to launch the product for retail sales. Broadcast Arts received royalties from the retail sales based on its agreement with Harriet Carter and NPI.

By July 2005, NPI planned to replace Medallion as the exclusive supplier of Urine Gone solution for the launch of sales to retail outlets, catalogs, and Internet website sellers. NPI and H.C.T.V. sold the counterfeit product but continued to market it as the Medallion product by reference to the infomercial and scientific testing demonstrating the effectiveness of the product. In July 2005, NPI and H.C.T.V. placed a direct order to Medallion's own supplier of bottles, non-defendant Patrick Plastics. NPI ordered blacklights from another supplier without knowledge or appreciation for the significance of the blacklights' UV rating in detecting urine glow.

In the Fall of 2005, Urine Gone appeared in several retail outlets; and Medallion began receiving customer complaints regarding the performance of the Urine Gone product. On October 1, 2005, a representative of Medallion purchased a box of Urine Gone and submitted samples of Urine Gone for independent laboratory testing. The lab tests revealed that the

5

solution was not Medallion's product as it had no enzyme action by which urine could be completely eaten and digested. The blacklight included in the box of Urine Gone had a different UV range, and its illumination was brighter and could not pick up the urine glow.

On or about October 21, 2005, Medallion served notice on all of Defendants, except Broadcast Arts, that they were selling a counterfeit product based on false advertising. Specter, McAlister, and NPI participated with Timlin to suppress test information, create false and misleading test data and furnish false information about the product to customers and other interested parties in order to perpetrate fraud on public by the continued sale of the counterfeit solution as the product "As seen on TV."

## ANALYSIS

### *Personal Jurisdiction Over Broadcast Arts*

Broadcast Arts argues that it should be dismissed because the Court lacks personal jurisdiction over it. Plaintiffs argue that jurisdiction lies in this Court because Plaintiffs are victims of tortious acts and have suffered injuries in Illinois as a result of Broadcast Arts' actions.

Where personal jurisdiction is challenged by a defendant, the plaintiff bears the burden of demonstrating its existence. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997) (*RAR*). "When [a] district court rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing, . . . the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003), *quoting Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). A court may look to affidavits and exhibits submitted by

each party in determining whether jurisdiction exists. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987) (*Turnock*). The allegations in the complaint are taken as true unless controverted by the defendant's affidavits, and any conflicts in the affidavits submitted by the parties are resolved in favor of the plaintiff. *See Berthold Types Ltd. v. European Mikrograph Corp.*, 102 F. Supp. 2d 928 (N.D. Ill. 2000), *citing Turnock*, 816 F.2d at 333.

A federal district court in Illinois has jurisdiction over a non-resident defendant only if an Illinois state court would have jurisdiction over that defendant. *See RAR*, 107 F.3d at 1275. A plaintiff must also show that the exercise of personal jurisdiction over the defendant comports with due process under the Fourteenth Amendment of the United States Constitution. *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 833–34 (N.D. Ill. 2000) (*Euromarket*).

The Illinois long-arm statute provides a list of specific acts that serve to submit the actor to the personal jurisdiction of the state's courts:

> (a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts: . . . (2) The commission of a tortious act within this State; . . . on any other basis . . . permitted by the Illinois Constitution and the Constitution of the United States.

735 ILCS 5/2-209(a)(2). Because of this broad language, "the statutory analysis collapses into a due process inquiry, and [the court] need not consider whether the defendants engaged in any of the acts enumerated in the long-arm statute." *Euromarket*, 96 F. Supp. 2d at 834, *quoting LFG, LLC. v. Zapata Corp.*, 78 F. Supp. 2d 731, 735 (N.D. Ill. 1999). An Illinois federal district

court need only show that the Fourteenth Amendment's due process requirement is satisfied in order to exercise personal jurisdiction over a non-resident defendant. *Euromarket*, 96 F. Supp. 2d at 834.

A plaintiff can assert either general or specific personal jurisdiction over a non-resident defendant. *RAR*, 107 F.3d at 1277. "General jurisdiction is for suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has 'continuous and systematic general business contact' with the forum state." *RAR*, 107 F.3d at 1277. Specific jurisdiction "refers to jurisdiction over a defendant in a suit 'arising out of or related to the defendant's contact with the forum.'" *RAR*, 107 F.3d at 1277, *quoting Helicopteros Nacionales de Columbia, S.A. v. Hall*, 486 U.S. 408 (1984). The parties agree that the exercise of specific personal jurisdiction over Broadcast Arts, based on the alleged torts, is at issue here.

The Fourteenth Amendment Due Process Clause permits a court to exercise specific personal jurisdiction over a non-resident defendant only if the defendant has had "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), *quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940); *Neuman & Assoc. v. Florabelle Flowers*, 15 F.3d 721, 725 (7th Cir. 1994). In order to find such minimum contacts, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The critical inquiry is whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court in the forum state." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

8

Plaintiffs argue that Broadcast Arts directed tortious acts toward Illinois and against Illinois companies. Plaintiffs rely on the effects test doctrine to assert that this Court has specific jurisdiction over Broadcast Arts, a non-resident defendant. Broadcast Arts argues that it has no contacts with Illinois that satisfy the requirement of due process and that the application of the effects test does not support a finding of personal jurisdiction in Illinois.

The effects test doctrine allows for a finding of personal jurisdiction if the defendant's intentional tortious actions were expressly aimed at the forum state and caused harmed to the plaintiff in the forum state, of which the defendant knows is likely to be suffered. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (*Calder*). The doctrine permits recovery for personal jurisdiction if a defendant commits a tort against an Illinois corporation so that the injury is felt in Illinois.

Plaintiffs allege that Broadcast Arts participated in the conspiracy and knew or should have known that its tortious acts would have effects on Plaintiffs in Illinois. Plaintiffs argue that jurisdiction exists in this instant case based on the Supreme Court's decision in *Calder*. In *Calder*, a non-resident defendant was sued in California for libel after he authored a magazine article about the California activities of a California resident whose career centered in California. *Calder*, 465 U.S. at 790. The Supreme Court found that jurisdiction was proper in California because the defendant directed his activities at California. *Calder*, 465 U.S. at 783. However. the Seventh Circuit held in *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985) (*Wallace*), a year after the decision in *Calder*, "[w]e do not believe that the Supreme Court, in *Calder*, was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff." The court emphasized, "the constitutional touchstone

9

remains whether the defendant purposefully established 'minimum contacts' in the forum state." *Wallace*, 778 F.2d at 394, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (decided after *Calder*). Further, the *Wallace* court recognized that "the harm [in *Calder*] was uniquely related to California because the emotional distress and injury to professional reputation suffered by the plaintiff were primarily a result of the publication of the story to other California residents." *Wallace*, 778 F.2d at 395.

Plaintiffs cite *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) (*Janmark*). In that case, plaintiff and defendant sold mini shopping carts nationwide. *Janmark*, 132 F.3d at 1202. Defendant claimed that the mini shopping cart was copyrightable and attempted to convince plaintiff to cease its operation. *Janmark*, 132 F.3d at 1202. Plaintiff filed suit after defendant made phone calls to plaintiff's clients, specifically to a client in New Jersey, threatening to sue them for contributory copyright infringement. *Janmark*, 132 F.3d at 1202. The Seventh Circuit found that jurisdiction was proper in Illinois, holding that the injury occurred in Illinois when the New Jersey client ceased buying shopping carts from the plaintiff because of the defendant's actions. *Janmark*, 132 F.3d at 1202.

The effects test in *Calder* is not a substitute for the minimum contacts and purposeful availment inquiries; personal jurisdiction must still comport with due process as required by the Fourteenth Amendment. "[T]he key to *Calder* is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with the forum. Whether these effects, either alone or in combination with other contacts, are sufficient to support *in personam* jurisdiction will turn upon the particular facts of a case." *Wallace*, 778 F.2d at 395. In this instant action, despite the broad application of the effects test as applied in

*Janmark*, the facts of this present case are distinguishable; and the effects from Broadcasts Arts alleged tortious actions are insufficient as to support *in personam* jurisdiction.

Broadcast Arts' contacts with Illinois are significantly more attenuated than that of the defendant's contacts with California in *Calder*, as well as that of the defendant's contacts with Illinois in *Janmark*. Unlike in *Janmark*, where defendant sold mini shopping carts nationally, Broadcast Arts is a Florida corporation that conducts business in Deerfield Beach, Florida. It has no offices, employees, shareholders, telephone listings, bank accounts, or property in Illinois. Broadcast Arts filmed the Urine Gone infomercial in Florida. John Miller, Vice-President of Broadcast Arts, directly contacted Kroeger of Medallion in Illinois on only one occasion, when he requested samples of the product for the shooting of the infomercial. During shooting of the infomercial, Kroeger and a representative from Performance traveled to Florida to attend two days of the shooting. No representative of Broadcast Arts ever traveled to Illinois. Broadcast Arts filmed the infomercial under contract with two Pennsylvania defendants, H.C.T.V. and Direct Response. Broadcast Arts did not contract with Plaintiffs in producing the infomercial. The production contract for the infomercial bares no signature of any representative of Medallion or any of the other Plaintiffs in this case. After the infomercial was filmed, Broadcast Arts sent the infomercial to North Country Duplication in Montana, which was responsible for the infomercial's placement. While Broadcast Arts did receive royalties from the sale of the product, it played no role in the decision of where to broadcast the infomercial or sell the product. Unlike in *Calder*, where defendant's activities were expressly aimed at the forum state, (*Calder*, 465 U.S. at 790), Broadcast Arts' sole function was to produce an infomercial at the direction of H.C.T.V. and Direct Response in Florida. Broadcast Arts' activities in this instant case were not directed at an Illinois forum.

11

The Seventh Circuit found jurisdiction based on the effects doctrine in *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Partnership*, 34 F.3d 410, 412 (7th Cir. 1994) (*Colts*). There, "the defendant had done more than brought an injury to an interest located in a particular state. The defendant had also 'entered' the state in some fashion." *Colt*, 34 F.3d at 410. Here, any effect that the alleged tortious activities had in Illinois was not the result of Broadcast Arts' active participation, i.e. entry into Illinois; rather, Broadcast Arts played a passive role in the alleged tortious actions, i.e. producing the infomercial in Florida. Broadcast Arts did not have an active role in bringing the alleged tortious actions into Illinois and causing injury there. Thus, Broadcast Arts' contacts with Illinois are so attenuated that it would violate the due process clause of the Fourteenth Amendment to exercise *in personam* jurisdiction over it in this matter.

For the foregoing reasons, Plaintiffs have failed to establish that Broadcast Arts expressly directed its activities at Illinois. Because Broadcast Arts has not been shown to be an active participant, directing its activities at the desired forum state, the necessary minimum contacts have not been satisfied. Broadcast Arts' Motion to Dismiss for Lack of Personal Jurisdiction is granted.

### Personal Jurisdiction Over ICC Defendants

ICC Defendants argue that they should be dismissed because the Court lacks personal jurisdiction over them. Plaintiffs' Second Amended Complaint was dismissed by this Court as to ICC Defendants because Plaintiffs failed to establish the necessary requirement of a

"conspiracy theory of jurisdiction." Plaintiffs now claim that they have evidence of ICC Defendants' committing tortious acts against them and that this Court has jurisdiction as to ICC Defendants under the effects test. ICC Defendants argue that Timlin and ICC had no knowledge of Medallion's existence when they were approached by NPI to formulate the product and, thus, cannot be subjected to this Court's jurisdiction.

In the instant case, under the effects test, jurisdiction exists over ICC Defendants. Plaintiffs have alleged that ICC Defendants entered into an agreement by which ICC would develop and supply a counterfeit cleaning solution to be used to fill the Urine Gone-labeled bottles and passed off as Plaintiffs' proprietary enzyme, acting as the product "As seen on TV." ICC and Timlin represented that they could develop a product that would replicate performance characteristics of the Medallion product. Based on the well-pleaded allegations, ICC Defendants knew or should have known that Medallion was based out of Illinois. The alleged tortious acts and alleged injury would have occurred in Illinois based on ICC Defendants' active role in interfering with business relations of prospective economic advantage and misappropriating Medallion's proprietary interest. By committing these alleged tortious actions, ICC Defendants entered Illinois as to render jurisdiction appropriate. Unlike Broadcast Arts, ICC Defendants' alleged tortious actions had direct effects on companies located in Illinois. Under the circumstances, it is foreseeable that ICC Defendants would be required to answer for such actions in Illinois.

For the foregoing reasons, ICC Defendants' motion to dismiss for lack of personal jurisdiction is denied.

In ruling on a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff. *Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). Federal Rule of Civil Procedure 8(a)(2) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To meet Rule 8(a)(2)'s requirements "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.' *Bell Atlantic Corp. v. Twombly*, ___U.S.___, ___, 127 S. Ct. 1955, 1964 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration in *Bell Atlantic*). Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court. *Bell Atlantic*, 127 S. Ct. at 1965, 1973 n.14." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 767 (7th Cir. 2007).

Count VII alleges a claim for unjust enrichment based on ICC Defendants' alleged misappropriation of the Plaintiffs' research, product development, contribution, and substantive content to the production of the infomercial. Medallion alleges that ICC Defendants misappropriated the infomercial and labels, the images of the Medallion product, the performance characteristics of the Medallion product, and/or laboratory tests conducted on the Medallion product in the marketing of the counterfeit solution. ICC argues that both the label and infomercial utilized the trademark "Urine Gone," which was issued to co-defendants by the Federal Patent Office. Thus, ICC contends that there can be no claim for unjust enrichment when the trademark is owned by Defendants.

Plaintiffs' unjust enrichment claim is based on ICC Defendants' alleged misappropriation of various proprietary rights and is not only based on the misappropriation of trade secrets or the trademark Urine Gone. Drawing all reasonable inferences in Plaintiffs' favor, the allegations in the Complaint comport with Rule 8(a)(2)'s requirements. As a result, Plaintiffs have sufficiently pled a valid unjust enrichment claim as to withstand a motion to dismiss.

Count XII alleges tortious interference with business relations of prospective economic advantage on behalf of Medallion against ICC Defendants. Medallion alleges that ICC Defendants intentionally interfered with its prospective business relationship with NPI Defendants and Harriet Carter, which caused these parties to discontinue purchasing Medallion's solution. ICC Defendants argue that Count XII should be dismissed because they were unaware of Medallion's business relationship with NPI Defendants and Harriet Carter and therefore could not interfere with relationships they did not know existed. Furthermore, ICC Defendants contend that Medallion has failed to allege that they acted with ill will or spite.

In Illinois, a plaintiff can recover for interference with an existing contractual right by proving: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *International Marketing, Ltd., v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 731 (7th Cir. 1999) (*International Marketing*), quoting *HPI Health Care Servs., Inc. v. Mt Vernon Hosp., Inc.*, 131 Ill.2d 145 (1989). This tort has several privileges that serve as a complete defense to the tort, the chief being competition. *See Speakers of Sport, Inc. v. Proserv, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999) (holding that competition is not a tort). The competitor is ineligible for the competition defense only if the

15

conduct in question is motivated solely by spite or ill will. *International Marketing*, 192 F.3d at 731, *citing Strosberg v. Brauvin Realty Servs., Inc.*, 295 Ill. App. 3d 17 (1998).

As *International Marketing* acknowledged, usually this competition defense is one raised at trial, unless the complaint so clearly reveals that judgment on the pleadings is possible. *International Marketing*, 192 F.3d at 731. Dismissal of the Second Amended Complaint for failure to state a claim at this time on this basis is, therefore, inappropriate. The issue as to whether ICC Defendants were aware of Medallion's business relationships with co-defendants also raises factual matters. The well-pleaded allegations plausibly suggest that ICC Defendants were aware of Medallion's business relationships with NPI Defendants and Harriet Carter. Plaintiffs have sufficiently pled the necessary requirements as to withstand a motion to dismiss.

Count X alleges a claim of civil conspiracy against all named defendants, including ICC Defendants. In order to state a claim for civil conspiracy, a plaintiff must allege both an agreement between two or more parties and an act in furtherance of the agreement. *McDonagh v. Bergan*, No. 03 C 1465, 2003 WL 21798735, at *5 (N.D. Ill. July 25, 2003). Plaintiffs allege that NPI Defendants and McAlister and Specter entered into an agreement with ICC to develop and market ICC's counterfeit formulation of Urine Gone as a substitute for Plaintiffs' secret proprietary formulation. ICC Defendants argue that Plaintiffs have not sufficiently pled specific facts of ICC Defendants' knowing participation in a conspiracy. Additionally, ICC Defendants contend that they cannot be held liable because named defendants in this action hold the existing trademark to Urine Gone and that, thus, their actions were legal.

The pleadings allege an agreement between two or more parties, including ICC Defendants, and are sufficient to state claims for unjust enrichment and tortious interference with business relations; Plaintiffs have sufficiently stated a claim for conspiracy. Therefore, ICC Defendants' Motion to Dismiss Count X is denied.

## CONCLUSION

For the foregoing reasons, Broadcast Arts' Motion to Dismiss for Lack of Personal Jurisdiction is granted. ICC Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is denied. The remaining ICC Defendants' Motions to Dismiss are also denied.

Date: _October 18, 2007_

JOHN W. DARRAH
United States District Court Judge