| | |
|---|---|
| MEDALLION PRODUCTS, INC., ENVERA, LLC, and PERFORMANCE CHEMICALS, INC., | ) ) ) ) |
| Plaintiffs, | ) ) Case No. 06 C 2597 |
| v. | ) ) Judge John W. Darrah |
| WILLIAM P. McALISTER, BRADLEY P. SPECTER, NATURE'S PILLOWS, INC., DIRECT RESPONSE, INC., MEDIA ENTERPRISES II, INC. d/b/a MEDIA ENTERPRISES, INC., PLYMOUTH DIRECT, INC., HARRIET CARTER GIFTS, INC., INTERNATIONAL CHEMICAL CORPORATION d/b/a INNOVATIVE CHEMICAL CO., and JAMES TIMLIN, | ) ) Magistrate Judge Geraldine Soat Brown ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Geraldine Soat Brown, United States Magistrate Judge

Before the court is the "Motion to Compel Production of Evidence Based on Crime Fraud Exception to Attorney-Client and Work Product Privileges" ("Mot.") filed by Plaintiffs Medallion Products, Inc., Envera, LLC, and Performance Chemicals, Inc. (sometimes collectively, "Plaintiffs"). [Dkt 317.] The motion is directed against defendants Nature's Pillows, Inc., Direct Response, Inc., Media Enterprises, Inc., William McAlister, and Brad Specter (sometimes collectively, "NPI Defendants"), as well as Plymouth Direct, Inc. (f/k/a H.C.T.V., Inc.), Harriet Carter Gifts, Inc., and

Steven Silbiger[1] (sometimes collectively, "Plymouth Defendants"). The NPI Defendants and Plymouth Defendants filed a consolidated opposition to the motion (dkt 339), and Plaintiffs filed a reply (dkt 348). For the following reasons, the motion is denied.

## INTRODUCTION

Plaintiffs' claims in this case

In this case, Plaintiffs allege, in summary, that they developed a pet-stain-removal solution for a product called "Urine Gone," and that the Plymouth Defendants, who marketed Urine Gone, agreed to purchase the solution exclusively through Plaintiffs. (Fourth Am. Compl. ¶¶ 33-36, 41.) [Dkt 305.] Plaintiffs allege that the Plymouth Defendants and their joint venturers, the NPI Defendants, breached the agreement to purchase Urine Gone exclusively from Plaintiffs and substituted a counterfeit product produced by the "ICC Defendants" (defendants International Chemical Corporation d/b/a Innovative Chemical Corporation and James Timlin) that was falsely marketed as the same as Plaintiffs' solution. (*Id.* ¶¶ 17, 18, 68-86.) Plaintiffs assert various claims, and certain Defendants have filed counterclaims.[2]

---

[1] Mr. Silbiger is not named as a defendant in the captions of the current Fourth Amended Complaint or the Third Amended Complaint, and apparently was terminated as a defendant on April 10, 2007. [*Compare* dkts 305 & 141 *with, e.g.,* dkt 48.] Mr. Silbiger did, however, file a joint answer to the Fourth Amended Complaint (along with Plymouth Direct, Inc. and Harriet Carter Gifts, Inc.) on April 30, 2008. [Dkt 345.]

[2] Plaintiffs' Fourth Amended Complaint asserts claims under the Lanham Act, the Illinois Uniform Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Trade Practices Act, the Illinois Trade Secrets Act, and for breach of contract, fraud in the inducement, unfair competition, misappropriation of proprietary images, tortious interference with prospective business advantage, defamation, tortious interference with contract, tortious interference with prospective economic advantage, and conspiracy.

Plymouth Direct, Inc., Nature's Pillows, Inc., Direct Response, Inc., Innovative Chemical

<u>The present motion</u>

In their motion, Plaintiffs contend that Defendants' continued selling of "a substitute product" as having features possessed only by Plaintiffs' version of Urine Gone is a fraud. (Mot. at 1.) The gravamen of Plaintiffs' motion is that "Defendants' counsel actively aided that fraud by intentionally misleading the Federal Trade Commission in its investigation of the product for possible violation of the Federal Trade Commission Act . . . ." (*Id.*) Plaintiffs contend that Defendants' counsel "created" a fraudulent new defense: "it works <u>and</u> has enzymes," as a result of "counsel-directed investigations and product testing" that Defendants have not produced. (Mot. at 9.) Plaintiffs argue that the court should apply the crime-fraud exception to the attorney-client privilege and abrogate the privilege with respect to communications and actions in furtherance of the alleged fraud.

In particular, Plaintiffs argue that a letter written by an attorney for defendant Plymouth Direct, Inc. to the FTC in April 2006 is a "smoking gun" evidencing that Defendants "knew the Innovative product did not meet adverted [sic] statements of performance: Medallion's product works as advertised and Innovative's substitute cleans 'and has enzymes.'" (Mot. at 9; Reply at 3.)

While not suggested by the motion's title, Plaintiffs also argue that communications at a meeting among the defendants are not protected by the common interest doctrine. (Mot. at 8.)

Notably, the motion does not request any particular documents, for example, by reference to a privilege log. Rather, Plaintiffs ask the court to compel the Plymouth and NPI Defendants to

_____

Corporation, and James Timlin variously assert counterclaims against Plaintiffs and certain individuals including trade libel, defamation, conspiracy, maintenance, tortious interference with business relations, and violation of the Illinois Unfair Deceptive Trade Practices Act. [Dkts 345, 346, & 358.]

produce categories of documents, including memoranda reflecting interviews, investigations, testing or other communications by or among Defendants' counsel relating to using product testing in responding, *inter alia,* to the FTC or this lawsuit. (Mot. at 15-16.) Plaintiffs also seek to take the depositions of various Defendants and their attorneys "regarding matters revealed in these documents." (*Id.* at 16.)

## FACTUAL BACKGROUND

The parties have submitted more than four inches of briefs and materials on the motion. The motion contains serious accusations against counsel. The court has carefully reviewed the materials submitted by both sides to separate argument and inference from the actual evidence. That process was complicated by Plaintiffs' failure to cite any evidence or part of the record for certain factual statements.[3] Arguments in a brief, unsupported by documentary evidence, are not evidence. *United States v. Stevens*, 500 F.3d 625, 628-29 (7th Cir. 2007) (*quoting Campania Mgmt. Co. v. Rooks, Pitts & Poust,* 290 F.3d 843, 853 (7th Cir. 2002) ("[I]t is universally known that statements of attorneys are not evidence."). As it must, the court has disregarded any unsupported factual statements made by any party.

---

[3] For example, Plaintiffs state, "Defendants have stated that Mr. Massey [an attorney] was assigned to listen [to a meeting among Defendants] solely to protect such discussions from disclosure based on the attorney-client privilege; thus, this first year associate was not there to give legal advice to three different corporate groups." (Mot. at 7.) No supporting citation is provided. Similarly, Plaintiffs further state, "Mr. Garbose has testified that the purpose of the meting [sic] was for Plymouth to gather information so that it might respond to the FTC, not in anticipation of litigation." (Mot. at 8.) No supporting citation is provided. These are but two of many instances in Plaintiffs' Motion and Reply where statements are made without supporting evidence.

<u>The parties and their principals</u>

*Plaintiffs*: Medallion Products, Inc. ("Medallion") designs and markets consumer products. (Fourth Am. Compl. ¶ 5.) Monica Kroeger ("Kroeger") and Sheetal Ghai ("Ghai") are officers and employees of Medallion. (Medallion, Envera, Kroeger, & Ghai's Answer to Plymouth's Restated Countercl. ¶¶ 4, 5.) [Dkt 368.] Performance Chemicals, Inc. ("Performance") manufactures and sells chemical products. (Fourth Am. Compl. ¶ 6.) Performance's president is Joe Coligado. (*Id.* ¶ 27.) Envera, LLC ("Envera") provides biochemical technical and laboratory services, including the development and testing of biochemical agents. (*Id.* ¶ 7.) Michael Matheny ("Matheny") is Envera's managing partner. (Mot., Ex. 5, Aff. of Michael Matheny ¶ 1.)

*Plymouth Defendants:* Plymouth Direct, Inc. ("Plymouth") markets and distributes products on television and other media. (Plymouth Defs.' Answer to Fourth Am. Compl. ¶ 14.) Harriet Carter Gifts, Inc. ("Harriet") sells products through catalogs and internet sales. (*Id.* ¶ 15.) Plymouth and Harriet share common ownership. (*Id.* ¶ 16.) Plaintiffs allege that Steven Silbiger ("Silbiger") is an officer and employee of Plymouth and HCTV. (Third Am. Compl. ¶ 12.) According to Plaintiffs, William Garbose, who is not a defendant, is the president of Harriet and vice president of Plymouth. (Mot. at 7.)

*NPI Defendants:* Nature's Pillows, Inc. ("NPI"), Direct Response, Inc. ("Direct Response"), and Media Enterprises II, Inc. d/b/a Media Enterprises, Inc. ("Media Enterprises") are companies that market and sell consumer products. (NPI Defs.' Answer to Fourth Am. Compl. ¶¶ 10-12.) William McAlister and Brad Specter own NPI, Direct Response, and Media Enterprises. (*Id.*)

*ICC Defendants*: International Chemical Corporation d/b/a Innovative Chemical Corporation ("Innovative" or "ICC") develops, manufactures, and sells chemical products. (Innovative &

Timlin's Answer to Fourth Am. Compl. ¶ 17.) James Timlin is one of Innovative's owners and its chief executive officer. (*Id.* ¶ 18.)

<u>Medallion's letter to Defendants</u>

On October 21, 2005, Michael Lake, an attorney for Medallion, sent a letter addressed to Silbiger at HCTV (the predecessor of Plymouth), to Messrs. McAlister and Specter at NPI, and to Innovative, stating that Medallion had purchased a bottle of Urine Gone in a Walgreen's store and had tested its contents, and that the solution did not perform as the Medallion product does. (Mot., Ex.6.) The letter stated that the solution "does not eliminate the glow from a urine stain as seen under black light," "does not chemically react with urine residue to eliminate the odor-producing chemicals 'as seen on TV,'" and "there are almost no detectable enzymes in the solution," "[h]ence, no 'enzyme action.'" (*Id.* at 2.) Medallion's attorney demanded a report from NPI and HCTV by October 24, 2005, and threatened legal action, including an FTC investigation. (*Id.* at 3-4.)

The subsequent exchange of letters is relevant to Plaintiffs' argument about the common interest doctrine.[4] Responses to Lake's letter were sent by attorney Deborah Chadsey (of the Kavinoky Cook law firm) on behalf of Innovative, attorney Matthew Adler (of the Pepper Hamilton law firm) for NPI and Direct Response, and attorney Martin Faigus (of the Caesar, Rivise, Bernstein, Cohen & Pokotilow law firm) for Plymouth, on October 23, 24, and 28, 2005, respectively. (Opp'n, Ex. 1.) Ms. Chadsey and Mr. Adler both stated that their clients rejected any contention that Innovative's products are defective, and requested data supporting Mr. Lake's statements. (*Id.*) Mr.

_____

[4] The letters are included as a group exhibit with Mr. Lake's later letter to the FTC at Opp'n Ex. 1.

6

Adler referred to the possibility of his clients bringing claims against Medallion, and Ms. Chadsey stated that "Innovative is fully prepared to enforce and defend its rights and reputation." (*Id*), unnumbered attachments.) Mr. Adler sent copies of his letter to Ms. Chadsey and Mr. Faigus. (*Id.*) Mr. Lake sent a further letter to Mr. Adler and Ms. Chadsey on November 4, 2005, and copied Mr. Faigus. (*Id.*) Mr. Adler responded on November 10, 2005, copying both Ms. Chadsey and Mr. Faigus. (*Id.*)

Medallion's letter to the FTC

On December 15, 2005, Mr. Lake wrote to the FTC's Midwest Division and the FTC's Division of Advertising, stating, in summary, that Medallion had developed a proprietary enzyme-based solution for eliminating urine stains; that Medallion's product, along with a black light used to detect and monitor the stains, was the subject of nation-wide infomercial marketing but that the companies who were filling the orders generated from the infomercials, while still promising "enzyme action" "As Seen on TV," had substituted "a non-enzyme based product" for sale in the retail market (retail stores, catalogue, and internet). (Opp'n, Ex. 1 at 1.) Medallion asserted that Defendants were perpetuating a "significant deception of millions of customers" because the retail Urine Gone kits had "no enzymes, no citric acid, and an ineffective black light." (*Id.* at 6.) Mr. Lake attached the letters from Ms. Chadsey, Mr. Adler, and Mr. Faigus, which he called "threatening, and unhelpful." (*Id*. at 3.)[5]

---

[5] Mr. Lake's letter does not show copies to anyone on behalf of Defendants, and Plaintiffs do not suggest that they ever sent it to Defendants. In fact, Plaintiffs argue that Defendants "could not have seen it" until it was produced in discovery in another lawsuit, sometime after June 2006. (Reply at 5.)

Specifically, Medallion claimed that the ingredients for the product sold at retail had been changed significantly. (Opp'n, Ex. 1 at 3.) Mr. Lake told the FTC, "Medallion has had multiple samples from various retailers tested for the presence of enzymes and has found *no evidence of any enzymes in the solution*. See Table of Test Results (Tables) below." (*Id.* (emphasis added).) Mr. Lake further said that a sample bought from the Harriet Carter catalogue "was also subsequently found to contain *no enzymes*, as seen in the Table below." (*Id.* (emphasis added).)

> Medallion argued to the FTC that:
>
> [T]he infomercials sell hard the fact that "enzyme action" will treat urine stains in a way that soap and water cannot. . . . "Enzyme action" is the scientific basis for the product and is the key ingredient for the claims and the independent laboratory testing done to verify the statements used in the infomercial and label packaging. Without enzymes in the formulation (and enzymes that work with the <u>speed and effectiveness</u> of the genuine solution), the product is not the same "As Seen on TV". Additionally, the package labeling of the non-Medallion product states that it has "enzyme action" when as seen in the Table below, *no enzymes exist*.

(*Id.* at 4 (italicized emphasis added).)

The "Table" in Lake's letter compares test results for Urine Gone acquired by Medallion at retail (*i.e.,* Innovative's version) with test results for Medallion's solution. (*Id.* at 5.) Defendants particularly contest the column entitled "Enzyme Count per gram/milliliter," which reports that for the retail Urine Gone, the count was less than 10 CFU. (*Id.*) (The result for Medallion's formula is blacked out.) Notably, the test results purportedly supporting the "enzyme count" column reported the "aerobic plate count," not enzymes. (Opp'n Ex, 1, attachments J & K.) Aerobic plate count is a measurement of bacterial activity, in which oxygen is measured to determine the amount of bacteria in a given sample. (Opp'n, Ex. 2, 12/18/07 Dep. of Michael Matheny at 69.) CFU generally means "colony forming unit," which measures the amount of bacteria needed to give rise to one

colony on an auger plate.  (*Id.* at 71-72.)

During his deposition, Mr. Matheny, managing partner of Envera, testified that aerobic plate counts and CFU measurements are used to determine the presence of bacteria, not enzymes.  (*Id.* at 69, 71-72.)  He stated that enzymes and aerobic plate count "are totally different things."  (Opp'n, Ex. 3, 2/27/08 Matheny Dep. at 50.)  Mr. Matheny also admitted that Medallion's letter to the FTC used the word "enzyme" "incorrectly"; that  if he had seen a copy of the letter before it was sent he "would not have allowed it to go through like this"; and he agreed that it was "sort of inconsistent" for the letter's table to list colony forming unit counts under the heading "Enzyme Count." (12/18/07 Matheny Dep. at 131-33.)  Neither Ms. Kroeger nor Mr. Matheny saw the letter before Lake sent it, although Ms. Kroeger saw a rough draft (Matheny could not recall whether he saw a draft).  (Reply Ex. B, Dep. of Monica Kroeger at 123; Reply, Ex. C, 12/18/07 Matheny Dep. at 124-27.)

The FTC's letter to Plymouth

On March 8, 2006, Alysa Bernstein, a staff attorney for the FTC, sent a letter of inquiry to Silbiger at Plymouth, notifying him that the claims being made for Urine Gone sold through retail marketing channels might be in violation of Section 5 of the Federal Trade Commission Act.  (Mot., Ex. 18.)  The letter stated that the packaging of Urine Gone being sold through retail marketing channels included the claim that the product was "As Seen on TV" and "with Enzyme Action," and that while the infomercials for Urine Gone appeared to discuss enzyme action as "the key active ingredient" acting as an "odor and stain eliminator," the ingredients listed on the label failed to list any active enzyme ingredient.  (*Id.*)

The FTC asked that Plymouth provide, among other things: an assay of the ingredients for every formulation of Urine Gone sold from March 2005 through the letter's date; the name of any retailer who has sold each formulation; the advertising that was disseminated during the time each formulation was sold; and any testing upon which Plymouth relied to substantiate all claims made in the advertising and on the packaging for any version of the product sold through retail marketing channels, including substantiation for the claim that the product is a "stain & odor eliminator" with "Enzyme Action." (*Id.*)

Plymouth's retention of counsel

Richard McElroy, one of Defendants' attorneys accused by Plaintiffs in the motion, was retained by Plymouth, along with Blank Rome (then his law firm), in March 2006 to represent Plymouth in connection with the FTC inquiry. (Opp'n, Ex. 4, Decl. of Richard P. McElroy ¶ 6.) Mr. McElroy asked a Blank Rome associate, Lesli Esposito, to assist him in the representation. (*Id.* ¶ 7.) Ms. Esposito had been a staff attorney in the Competition Bureau of the FTC prior to being hired by Blank Rome a year earlier in March 2005. (*Id.*) On March 17, 2006, Ms. Esposito contacted Ms. Bernstein at the FTC to see if the FTC was flexible on the date for Plymouth's response to the FTC's letter. (*Id.* ¶ 8.) Ms. Esposito subsequently signed the April 12, 2006 response letter to the FTC, which Plaintiffs call the "smoking gun." (Mot., Ex. 20.)

The *Eckhaus* litigation

On March 2, 2006, Pamela Eckhaus filed a putative class action in the Eastern District of New York against NPI, McAlister, Specter, and Silbiger ("the *Eckhaus* litigation"). (*See* Class

Action Compl., *Eckhaus v. Nature's Pillows, Inc. et al.*) [Dkt 1, 06 C 985, U.S. Dist. Ct., E.D.N.Y.]

That complaint alleged claims for consumer fraud and unjust enrichment arising out of the *Eckhaus*

defendants' alleged deception of consumers with respect to the advertising, promotion, and sale of

Urine Gone. (*Id.* ¶ 1.) The *Eckhaus* defendants were served with the class action complaint March

15, 2006. (*See* Summons, *Eckhaus v. Nature's Pillows, Inc. et al.,* 06 C 985, U.S. Dist. Ct.,

E.D.N.Y.) Messrs. Adler and Massey, with others, were counsel of record for NPI, Mr. McAlister,

and Mr. Specter. (*See generally Eckhau*s, 06 C 985, U.S. Dist. Ct., E.D.N.Y.) Mr. McElroy, along

with others, represented Mr. Silbiger.


Defendants' meeting

At some point after receiving the FTC letter, Messrs. Garbose, Silbiger, Timlin, and possibly

others met to discuss responding to the FTC letter as well as a letter Plymouth had received from the

Electronic Retailing Self-Regulatory Program. (Opp'n, Ex 17, Dep. of William Garbose at 159-

165.)[6] Ken Massey, an attorney from the law firm Pepper Hamilton, was present by phone. (*Id.* at

160; Mot. at 7.) The parties disagree about the date of the meeting, with Plaintiffs initially

contending it was "early March 2006" (Mot. at 7), Defendants contending that it was May 18, 2006

(pointing to an entry of that date on Massey's time sheets (Opp'n, Ex.16)), and Plaintiffs in reply

citing Mr. Timlin's testimony about meeting a person he believed was named Steve Silbiger in

---

[6] On March 24, 2006, the Electronic Retailing Self-Regulatory Program, Inc. ("ERSP"), an industry self-regulatory forum administered by the Council of Better Business Bureaus, sent Plymouth a letter relating to Urine Gone. (Opp'n, Ex. 10.) That letter and Plymouth's response are discussed further below.

Harriet Carter's offices in April 2006. (Reply at 15, citing Ex. H, Dep. of James Timlin at 110.)[7] The evidence in this record does not conclusively establish the date, although Mr. Garbose's testimony places it sometime after March 24, 2006, the date of the ERSP letter. (Garbose Dep. at 158.)

Plaintiffs' motion contains a number of factual statements about that meeting (see, *e.g.*, n. 3 above), but very little actual evidence about the meeting was submitted to the court. There is nothing in the record to support Plaintiffs' claim that "Defendants have stated that Mr. Massey was assigned to listen solely to protect such discussions from disclosure . . . ." (Mot. at 7.) Plaintiffs submitted only four pages of Mr. Garbose's deposition, consisting primarily of colloquy among counsel, Mr. Garbose's testimony that he did not remember the date of the meeting, and his affirmative answer to the question whether the purpose was to gather information to formulate a strategy to respond to the FTC and ERSP. (*See* Mot., Ex. 19, Garbose Dep. at 162.) Mr. Garbose's counsel instructed him not to answer deposition questions about the substance of the meeting, asserting Defendants' common interest in the attorney-client privilege and work product protection over that discussion. (Opp'n, Ex 17, Garbose Dep. at 163-165.)[8] Plaintiffs argue that the communications at that meeting were not privileged, and seek an order that the participants be

---

[7] Mr. Timlin was not asked directly about the meeting. In the deposition transcript excerpt Plaintiffs provide, Mr. Timlin was asked, "Did you ever deal with a person named Steve Silbiger?" He answered, "No, not really. I've met Steve once, but I had no real contact with him in any of this development. It was earlier this year. . . . Who I'm thinking of was Steve, a guy I met at Harriet Carter's office in say April of 2006, who I believe was a sales and marketing vice-president. And I believe his name was Steve Silbiger. If that's not true, then I'm misinformed, but that's who I was thinking of." (Timlin Dep. at 109-110.) There are no follow-up questions about the meeting in the deposition excerpts submitted by Plaintiffs.

[8] Defendants signed a joint defense agreement in September 2006. (Mot., Ex. 8.)

required to answer questions regarding the substance of the meeting and produce any memoranda prepared. (Mot. at 8.)

<u>Plymouth's response to the FTC</u>

Ms. Esposito responded to the FTC on behalf of Plymouth in a letter dated April 12, 2006. (Mot., Ex. 20.) Ms. Esposito explained that Plymouth and NPI jointly owned the trademark for "Urine Gone." (*Id.* at 1.) She stated that Plymouth marketed Urine Gone directly to consumers through infomercials and the internet, while NPI sold Urine Gone to retailers. (*Id.* at 1-2.) According to Ms. Esposito, Plymouth had bought its solution only from Medallion, while NPI had bought solution from both Medallion and Innovative.[9] (*Id.*)

Ms. Esposito stated, "Stains and odors are reduced through a chemical reaction caused by the enzymes in Urine Gone." (*Id.* at 1.) Plymouth contended that both formulations "contain enzymes and effectively remove stains and odors caused by pet and human accidents." (*Id.* at 2.) Ms. Esposito stated that Plymouth attempted to obtain the necessary documents responsive to the FTC's request regarding Medallion's formulation of the solution, but that Medallion refused on

---

[9] Plaintiffs contend that the letter's statement that Plymouth "sold only the Medallion product" solution for Urine Gone was a "deceptive half-truth when made and it remained uncorrected in later correspondence when Plymouth was buying from ICC." (Mot. at 10.) There is no support in this record for Plaintiffs' "half-truth" accusation. In fact, Plaintiffs state (albeit unsupported by any record citations) that Plymouth submitted two purchase orders to Medallion between the time of the FTC's letter and Esposito's response on behalf of Plymouth, but Medallion "countered" and the parties could not come to terms. (*Id.* at 10 n. 7.) Under those asserted facts, Plymouth had been and was trying to continue purchasing the solution from Medallion at the time of Esposito's letter. According to Plaintiffs (again, unsupported by any citation to the record), in May 2005, Plymouth bought from Innovative. (*Id.*) In any event, the focus of the FTC's inquiry was the claims for Urine Gone, not who was purchasing from whom.

confidentiality grounds to provide the documents to Plymouth and said it would submit them directly to the FTC. (*Id.*) With respect to Innovative's formulation, the letter enclosed an affidavit by Mr. Timlin, along with test results and other documentation, and stated that the enzymes in Innovative's formulation are "part of the 'proprietary blend' listed on the ingredient list on the bottle." (*Id.*)

Mr. Timlin's affidavit states (in part):

[Innovative's] formulation uses ingredients that have been selected to perform specific functions, such as the protease enzymes that work to hydrolyze the protein stain and Ordenone which neutralizes many specific odors, including ammonia and sulfur. The combination of Ordenone, Forestall and enzymes such as Puraflect work together to synergistically provided the enzyme action, which locates and removes odors and stains . . . . Puraflect 4000L is a protease enzyme which hydrolyzes and renders soluble proteins (only), helping to remove stains and odors.

(Mot., Ex. 20, attachment, Aff. of James Timlin ¶¶ 6-7.)[10] The affidavit included results by the Consumer Product Testing Co. on the efficacy of Urine Gone for removing odor and stains. (Timlin Aff., Ex. B.) It also included testing by Bio-Cat, Inc. for the amount of protein and active enzyme present in samples of Urine Gone. (Timlin Aff., Ex. C.) The results showed "noticeable Hydrolysis Around Sample" in all samples. (*Id.*) Hydrolysis is defined as "obvious breakdown or liquefaction of the solid gelatin" on which the solution was tested. (*Id.*)

Plaintiffs assert, "On information and belief, [Timlin's] affidavit was drafted for him not by his own attorney, but by Matthew Adler, attorney for the NPI Defendants," and on that assertion argue that Defendants should be required to produce all drafts of the affidavit. (Mot. at 9-10.) No record citation is set forth to support Plaintiffs' assertion. Plaintiffs note – again without citing any evidence – that at some unspecified later date Mr. Adler "used" Mr. Timlin's affidavit in the

---

[10] Portions of Mr. Timlin's affidavit refer to "Puraflect," while the testing results for Innovative's formula refer to "Puralect." It is assumed that "Puraflect" is an unintentional misspelling of "Puralect."

*Eckhaus* litigation.  (Mot. at 9-10, n. 5.)  Mr. Timlin testified that he was asked to prepare his affidavit by attorneys for Plymouth and NPI, but he worked with his attorney Ms. Chadsey in preparing the affidavit, and was not aware of anyone other than Ms. Chadsey who may have edited it, because all of his communication was with Ms. Chadsey.  (Reply, Ex. I, Dep. of James Timlin at 6, 11.)

In the following months, Ms. Esposito continued to respond to questions from Ms. Bernstein at the FTC.  (*See* Opp'n, Ex. 14; Reply, Ex. D.)  On August 8, 2006, Ms. Esposito confirmed with the FTC that the FTC had concluded its investigation.  (Reply, Ex. D.)  In September 2006, Ms. Esposito also provided Ms. Bernstein with copies of the materials Plymouth had provided to the ERSP. (*Id.*)

The ERSP investigation

In its March 24, 2006 letter to Plymouth, the ERSP identified several representative "core claims" being communicated in the Urine Gone infomercial and asked Plymouth to, among other things, "provide substantiation for these core claims," as well as "any relevant product and/or consumer research" Plymouth had conducted.  (Opp'n, Ex. 10 at 2-3.)  Ms. Esposito submitted a response for Plymouth that was substantially the same as that submitted to the FTC.  (Mot., Ex. 21.)

On or about June 22, 2006, the ERSP issued a press release regarding its inquiry's findings. (Reply, Ex. J, ERSP News.)  Following its review of the evidence submitted, the ERSP found that Plymouth's laboratory testing supported efficacy claims related to the removal of odors, but recommended that claims related to stain removal be modified to be more consistent with testing results.  Among other things, the ERSP found that the Innovative product's claim that "Laboratory

15

tests prove even set in stains are no problem for Urine Gone's powerful enzyme action" to be "not completely accurate and subject to potential misinterpretation," because testing showed that "set in stains" were not always eliminated.  (*Id.* Ex. J., ERSP Analysis at 4.)

The ERSP expressed concern regarding the claim that "Stains and odors disappear and keep pets from re-marking their territory," because testing was conducted in a laboratory and naturally occurring pet behavior had not been tested.  (*Id.* at 6.)  However, the ERSP found that "the information on the individual enzymes and ingredients used in the proprietary blend of Urine Gone and tested by the marketer [Plymouth] did provide a reasonable basis for the claims 'Cleans and deodorizes at the same time' and 'Enzyme action gets to the source of the odor eliminating it for good!'"  (*Id.* at 7.)  The ERSP recommended that claims regarding the stain-removal efficacy of the product, as well as the comparative claims, be modified to be more consistent with the testing.  (*Id.* at 6.)  Plymouth advised the ERSP that it was preparing a new advertisement.  (Reply, Ex. J, ERSP Compliance Inquiry.)  Upon learning that litigation (including this lawsuit) had been filed regarding advertising for Urine Gone, the ERSP followed its policy to close its inquiry.  (*Id.*)


Plaintiffs' tests on Innovative's solution

According to Defendants, Plaintiffs had additional tests done on Innovative's formulation in the summer of 2006, and those tests were positive for the protease enzyme (Opp'n at 15, citing Ex. 13), although the results are difficult to interpret on the submitted exhibit.


Matheny's affidavit in support of the present motion

Plaintiffs submit Mr. Matheny's affidavit describing his creation of the formula for

Medallion's solution. (Mot., Ex. 5, Aff. of Michael Matheny.) Mr. Matheny states he developed a specific blend of microbial spores that create enzymes for use in Medallion's solution. (*Id.* ¶¶ 3-4.) According to Mr. Matheny, the spores act like bacteria found in the human digestive tract. Upon contact with the targeted waste, "the spores germinate and actually create the specific enzyme necessary to eat and digest the organic waste in the same manner that enzymes are created in the human digestive system to digest consumed foods." (*Id.* ¶ 3.)

In contrast, according to Mr. Matheny, Innovative did not use spores to create an enzyme-acting cleaner. (*Id.* ¶ 7.) In his opinion, the Purafect 4000L protease enzyme used by Innovative acts only to break up protein, of which there is little or none in healthy urine, and does not eat or digest anything. (*Id.* ¶¶ 8, 10.) In his view, the Innovative solution is not "an enzyme cleaning product." (*Id.* at ¶ 19.)

Mr. Matheny cites tests on Innovative's solution for Urine Gone dated November 11, 2005 by Bio-Cat, Innovative's supplier of Purafect. (Matheny Aff., Ex. D.) The tests found no protease activity, a fact that Mr. Matheny attributes to the Purafect enzyme being unstable and self-consumed between the date of manufacture and testing. (Matheny Aff. ¶ 14.) The record on the motion does not contain any other evidence about those November 15, 2005 tests, other than the results themselves.[11]

---

[11] While the parties' evidentiary submissions include several other test reports by Bio-Cat as well as SF Analytical Laboratories, Inc. (*see, e.g.*, Mot., Exs. 10 & 12; Opp'n, Ex. 13), the parties do not provide any substantive analysis of those reports.

<u>McElroy's affidavit in opposition to the present motion</u>

Defendants submit Mr. McElroy's affidavit (Opp'n, Ex. 4), describing, *inter alia,* his and Ms. Esposito's representation of Plymouth in the FTC investigation. Because their client Plymouth did not manufacture the solution, it was necessary to contact Medallion and Innovative for information; Innovative cooperated, while Medallion refused. (McElroy Aff. ¶ 9.) Mr. McElroy states that he and Ms. Esposito did not make any changes to Mr. Timlin's affidavit submitted to the FTC, and, to the best of his knowledge, neither did Mr. Adler. (*Id.* ¶ 11.) He also notes that Mr. Timlin's affidavit and attached test results appeared to substantiate the claims fully, and that the affidavit states that Innovative's formulation "contains and always contained enzymes and that the enzymes play a role in the product's elimination of stains and odors of urine." (*Id.* ¶ 10.)

Mr. McElroy further states that the test results submitted to the FTC were the only tests of Innovative's version that Mr. Timlin provided and the only tests that Ms. Esposito or he knew existed at the time Plymouth made its submission to the FTC. (*Id.* ¶ 12.) He states "unequivocally" that no one at his former firm or the Plymouth Defendants commissioned any tests of Innovative's formula except in connection with experts in this litigation, and that he is not aware of any of such tests commissioned by the NPI Defendants or their counsel. (*Id.*) He states, "The Defendants have produced during discovery all tests of the Innovative formulation of which they had knowledge," with the exception of tests done by experts for this litigation. (*Id.* ¶ 13.)[12]

---

[12] Because expert discovery is now concluded, presumably the expert reports and test data have been disclosed.

# LEGAL STANDARD

**A.      The Attorney-Client Privilege and the Common Interest Doctrine.**

In order for the attorney client privilege to attach, the communication in question must be made (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).

> Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities.

*Id*. (citing *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999)).  Litigation need not be pending for the communication to be made in connection to the provision of legal services, but only "those communications which reflect the lawyer's thinking or are made for the purpose of eliciting the lawyer's professional advice or other legal assistance fall within the privilege." *Id.* (citation and quotations omitted).

While sometimes termed a privilege itself, "the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person." *BDO Seidman*, 492 F.3d at 815.  It extends the attorney-client privilege to communications made by a party not to his own lawyer, but to an attorney for another party, where the parties undertake a joint effort with respect to a common legal interest. *Id*.; *United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir. 1997).  It is not necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney. *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989).  The common interest doctrine is

limited strictly to those communications made to further an ongoing enterprise, but the communications need not be made in anticipation of litigation to fall within the doctrine. *BDO Seidman*, 492 F.3d at 816.

## B.      The Crime-Fraud Exception

> The crime-fraud exception places communications made in furtherance of a crime or fraud outside the attorney-client privilege. The exception is based on the recognition that the privilege necessarily will protect the confidences of wrongdoers. This cost is accepted as necessary to achieve the privilege's purpose of promoting the broader public interests in the observance of law and the administration of justice. However, when the advice sought relates *not to prior wrongdoing,* but to *future wrongdoing*, the privilege goes beyond what is necessary to achieve its beneficial purposes."

*BDO Seidman*, 492 F.3d at 818 (quotations and citations omitted) (emphasis in original).

"The attorney-client privilege is of crucial importance to our jurisprudence, and its derogation is not to be undertaken lightly. The privilege is waived, however, when the client uses the attorney-client relationship to engage in fraudulent or criminal activity rather than merely to defend against charges." *United States v. Davis*, 1 F.3d 606, 611 (7th Cir. 1993).

Merely making a claim of fraud, however, is not sufficient. "[T]he party seeking to abrogate the attorney-client privilege must present prima facie evidence that 'gives colour to the charge' by showing 'some foundation in fact.'" *BDO Seidman*, 492 F.3d at 818 (*quoting United States v. Al-Shahin,* 474 F.3d 941, 946 (7th Cir. 2007) and *Clark v. United States,* 289 U.S. 1, 15 (1933)).

"'Prima facie evidence' d[oes] not mean enough to support a verdict in favor of the person making the claim." *Davis,* 1 F.3d at 609 (quotation and citations omitted). Instead, "a party has established a prima facie case whenever it presents evidence sufficient 'to require the adverse party, the one with superior access to the evidence and in the best position to explain things, to come

forward with that explanation.'" *Id.* (citation omitted). The privilege will remain if the court finds the explanation satisfactory. *Id.*

In overcoming the privilege, the court, at the request of the party opposing the privilege, "may review the allegedly privileged communications *in camera* to determine whether the crime-fraud exception applies." *United States v. Zolin,* 491 U.S. 554, 564 (1989). A lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege:

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, <u>the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.</u> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Id.* at 572 (citations and quotations omitted) (underlined emphasis added.)

Plaintiffs' motion is evaluated in light of those standards.

## ANALYSIS

I.     **Defendants' threshold arguments**

As a threshold point, Defendants argue that Plaintiffs' motion is not timely, because it was filed a month after the close of fact discovery. (*See* Opp'n at 7-8.) Plaintiffs respond that they focused on motions "more inter-related with ongoing discovery that had to be completed." (Reply at 2-3.) While Defendants' argument has some force, because the motion is denied on the merits, it is not necessary to reach the issue of timeliness.

As a second threshold point, Defendants argue that the motion is actually Plaintiffs' effort to reverse the FTC's decision not to take action with respect to Defendants, and that such a decision is beyond this court's jurisdiction. (Opp'n at 9-10.) The court interprets the motion as a discovery motion, rather than one seeking the review of an administrative decision, and this ruling is limited to determining whether the Plaintiffs have made a sufficient showing to implicate the crime-fraud exception to the attorney-client privilege.

## II.     The common interest doctrine protects communications at the parties' meeting.

Plaintiffs contend that documents and testimony related to the Defendants' meeting in the spring of 2006 are not privileged and should be compelled. (Mot. at 7-8.) Plaintiffs argue that the common interest doctrine does not protect those communications because the meeting's purpose was not related to current or potential litigation, but instead to Defendants' "common business interest in responding to and getting a favorable ruling from the FTC." (Mot. at 8.) Plaintiffs do not dispute that Ken Massey, an attorney with the firm of Pepper Hamilton (which represented NPI, Mr. McAlister, and Mr. Specter in the *Eckhaus* litigation, as well as in this matter), participated in the meeting by telephone, but Plaintiffs assert that he "was assigned to listen solely to protect such discussions from disclosure based on the attorney-client privilege . . . ." (*Id.* at 7.) Plaintiffs observe that a written joint defense and tolling agreement was signed in September 2006. (*Id.* at 8.)

The evidence submitted on the motion supports Defendants' assertion of the common interest doctrine with respect to the meeting, whether it took place in March, April, or May 2006. Contrary to Plaintiffs' claim, the meeting cannot be properly characterized as for a business rather than legal purpose. Although litigation need not to be actual or imminent for communications to be protected,

(*BDO Seidman*, 492 F.3d at 815-16, n.6), Defendants had received earlier threats of legal action from Medallion, and according to Mr. Garbose's deposition testimony, the meeting occurred after Plymouth had received the FTC's and ERSP's inquiry letters, the latter dated March 24, 2006. Defendants had responded to the earlier correspondence from Medallion's attorney by letters from their own attorneys, which they copied to each other, and which likewise threatened litigation. The letter from the FTC was from an attorney, and, accordingly, the response was submitted by an attorney for Plymouth. As Mr. McElroy states in his affidavit, Plymouth did not have all of the information necessary to respond to the FTC, and it was necessary to get information from Innovative about the formulation in order for counsel to prepare a response.

Furthermore, litigation was actually pending as of March 2, 2006, when the *Eckhaus* class action was filed. The *Eckhaus* defendants had notice of that suit no later than March 15, 2006, when they were served with the class action complaint. As noted above (*see* n. 3), Plaintiffs cite no record support for their assertion that Massey, an attorney of record in the *Eckhaus* litigation, was "merely a permitted eavesdropper" at the meeting. (Mot. at 8.) And while Mr. Garbose agreed with Plaintiff's attorney's characterization that discussing Defendants' response to the FTC's and ERSP's inquiry letters was *a* purpose of the meeting, he did not state that purpose was the only one.

The fact that Defendants later executed a written joint defense agreement does not deprive their earlier communications of privilege. Defendants' written joint defense agreement, executed in September 2006, does not indicate its effectiveness is prospective only, and its statement that exchanges of information and materials between Defendants or their counsel "shall *remain* confidential and privileged" grammatically applies both to past and future such exchanges. (Mot., Ex. 8 at 3 (emphasis added).)

Regardless of when after March 24, 2006 the meeting at issue occurred, by that time Defendants had a common legal interest in defending against Medallion's and Eckhaus' allegations of wrongdoing regarding Urine Gone, as well responding to the FTC's and the ERSP's inquiries regarding the product. The parties at the meeting were "undertak[ing] a joint effort with respect to a common legal interest" and their communications made to counsel to further that ongoing enterprise are protected. *BDO Seidman*, 492 F.3d at 815-16. [13]

### III.    Plaintiffs have not made a prima facie showing.

After carefully considering the evidence and argument, the court concludes that Plaintiffs have not presented prima facie evidence that gives color to the charge of fraud by showing some foundation in fact. The court also concludes that Plaintiffs have not carried even the lesser burden of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of withheld materials may reveal evidence to establish the claim that the crime-fraud exception applies, as required by *Zolin,* 491 U.S. at 572.[14]

Plaintiffs allege that there is an "ongoing fraud based on knowing misrepresentations in advertising" which Defendants' counsel aided by "intentionally misleading" the FTC. (Mot. at 1; Reply at 2.) The alleged deception is that Plymouth's counsel's response to the FTC "deftly

---

[13] Although, as discussed above, Plaintiffs presented no evidence to support their claim that Adler played a role in drafting Timlin's affidavit submitted to the FTC, the common interest doctrine would also extend the attorney-client privilege to any communications by Timlin or his counsel with Adler on the subject of the affidavit.

[14] As observed above, Plaintiffs have not identified any specific documents they would request be taken *in camera*. Rather, they speculate that unproduced documents must exist, and request this court to order categories of such documents be produced.

evade[d] the central issue" of "whether the ICC product does or does not clean with powerful enzyme action as claimed" and "instead state[d] that the ICC version is an effective cleaner of pet and human urine stains and odors <u>and</u> it has enzymes." (Mot. at 11, emphasis in original.) According to Plaintiffs, this "deft use of misleading and deceptive language" "fooled" the FTC into closing its investigation. (Mot. at 11.)

The record before the court simply does not support Plaintiffs' claim that Defendants' counsel knowingly participated in a deception of the FTC. From the evidence presented in the motion, the dispute between the parties is a difference of opinion between putative experts. Plymouth's counsel presented Defendants' position to the FTC, and relied on Mr. Timlin's affidavit for the facts to support that position.

Plaintiffs acknowledge that the issue is not the efficacy of Defendants' version of Urine Gone. Plaintiffs state, "Whether a product 'works' or doesn't is too subjective to answer definitively and has never been an issue. Rather, the question posed by the FTC, ERSP, and Plaintiffs is whether it works as advertised . . . ." (Reply at 10, n. 10.) In Plaintiffs' view, Innovative "added a few drops of a worthless enzyme that does nothing for the product . . . ." (Id. at 10, n. 11.) For Plaintiffs, the issue is whether the chemical process by which Innovative's formulation works can be considered "enzyme action." (*Id*.)

As the evidence discussed above discloses, Medallion's attorney, Mr. Lake, contacted the FTC in December 2005, stating that the retail version of Urine Gone had "no enzymes." (Opp'n, Ex 1.) Mr. Lake told the FTC that "the package labeling of the non-Medallion product states that it has 'enzyme action' when . . . no enzymes exist." (*Id*. at 4.) Defendants were not sent a copy of Lake's letter to the FTC, but Defendants received Mr. Lake's October 2005 letter threatening an FTC

investigation in which he made virtually the same statement, saying that the "potentially most egregious" problem with Defendants' labeling was that "there are almost no detectable enzymes in the solution. Hence, no 'enzyme action.'" (Mot., Ex. 6 at 2.) It is not surprising, therefore, that Plymouth's response included evidence that Innovative's solution has enzymes, as well as contending that it works as advertised.

Although Plaintiffs argue that Mr. Lake's letter to the FTC is a "red herring" because Defendants did not receive a copy (Reply at 4), the issue on the motion is whether there was a fraud on the FTC. The information that the FTC had before it is, therefore, relevant. The FTC had Mr. Lake's letter saying Defendants' formulation of Urine Gone had "no enzymes." The FTC received a response from Plymouth stating that Innovative's formulation has enzymes – which is undisputed, although not the type of enzyme that Medallion believes is most effective.

The FTC's letter asked Plymouth to substantiate the claim that Urine Gone is a "stain & odor eliminator" with "Enzyme Action." (Mot., Ex. 18 at 2.) Contrary to Plaintiffs' claim, Plymouth's response addressed the issue of "enzyme action." It expressly stated that the protease enzyme used in the formulation worked on "proteins (only)," and set out Defendants' position that "[t]he combination of Ordenone, Forestall and enzymes such as Puraflect [sic] work together to synergistically provide the enzyme action, which locates and removes odors and stains." (Timlin Aff. ¶ 7.)

The chemical composition of Innovative's formulation for Urine Gone is not in dispute. Notably, Plaintiffs do not argue that Defendants misrepresented the composition to the FTC. Mr. Matheny, on behalf of Plaintiffs, acknowledges that Innovative's solution contains an enzyme. Matheny contends, in essence, that the protease enzyme included in the Innovative solution does not

justify describing Defendants' Urine Gone formulation as cleaning by "enzyme action" in the way that the Medallion formulation does. Defendants, supported by Mr. Timlin's affidavit, believe that such a description is justified. Plaintiffs and Defendants differ on the whether Innovative's formulation described by Mr. Timlin constitutes "enzyme cleaning action," but there is no evidence in the record on this motion that Mr. Timlin's affidavit misrepresented Innovative's formulation or the way it works.

The evidence presented shows no basis to believe that Defendants' counsel concealed any facts from the FTC or did anything other than present their clients' position to the FTC based on the information provided to counsel. Plaintiffs speculate that tests on Innovative's formulation were done at Defendants' counsel's direction after Mr. Lake's October 2005 letter and that those test results have not been produced in discovery. (Mot. at 3, 9.) But Mr. McElroy states in his affidavit that Defendants have produced all tests of which they have knowledge except those done by experts for this litigation. There is no factual basis to believe otherwise.

Plaintiffs point to the November 11, 2005 tests done by Bio-Cat that showed no protease activity. The record before the court does not say how or when those tests were produced in discovery, although the documents bear a bates number suggesting they were produced by the ICC Defendants. There is no evidence in the record before the court to suggest that counsel for the NPI or Plymouth Defendants knew of those tests at the time of responding to the FTC, and Mr. McElroy affirmatively states that the test results included with the response to the FTC were the only ones he or Esposito knew existed at the time. In any event, the Bio-Cat results were produced in discovery, and there is no basis to believe there are other, unproduced test results.

The court wishes to emphasize that there is *no evidence* in the record to support Plaintiffs'

innuendos of improper contact between Defendants' counsel and the FTC. (*See, e.g,* Mot. at 9, n. 4, speculating – without any factual support – that "prior contact . . . might explain why . . . the FTC sent its inquiry to Plymouth Direct instead of NPI . . . .") Plaintiffs also assert – again without evidence – that Ms. Esposito "was advanced as a signatory because of her relationships at the FTC, her former employer." (Reply at 6-7.) The innuendo that Ms. Esposito had "relationships" at the FTC that influenced the agency's action in the investigation, including the suggestion that Ms. Esposito and Ms. Bernstein knew each other or were friends (*id*. at 7), is utterly *without factual support* in the record before the court.[15]

As the Supreme Court has said, a charge of fraud alone is not sufficient to abrogate the attorney-client privilege. *Clark,* 289 U.S. at 15. There must be a foundation in fact. While the evidence on the motion need not rise to the level of proving fraud, there must be facts that "give color" to the charge of fraud. Plaintiffs' motion lacks those facts. Accordingly, the motion is denied.

IT IS SO ORDERED.

Geraldine Soat Brown
United States Magistrate Judge

October 9, 2008

---

[15] In an earlier order in this case, the court drew counsel's attention to the Rules of Conduct for Attorneys Practicing in the Seventh Circuit. (*See* May 18, 2007 Order.) [Dkt 174.]. The Standards for Professional Conduct within the Seventh Federal Judicial Circuit list the following among Lawyers' Duties to Other Counsel: "4. We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety." 7th Cir. Ct App., Stands. for Prof. Cond. Within the 7th Fed. Jud. Cir., http://www.ca7.uscourts.gov/Rules/rules.htm#standards (last updated Jan. 1, 2008). Counsel who practice in this Circuit are expected to comply with these standards.